[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 888 
Appellant was convicted under § 13A-5-31 (a)(3) Code of Alabama 1975 for carnal knowledge of a girl under twelve years of age, or the abuse of such girl in an attempt to have carnal knowledge, during which the victim was intentionally killed by the appellant. After a hearing on aggravating circumstances, the jury returned a verdict fixing the appellant's sentence at life imprisonment without parole. Appellant's motion for new trial was denied, and this appeal followed.
The victim in this case was Wendy Wakin, a six year old girl, whose body was found floating in the Conecuh River on September 22, 1980. Dr. Thomas Gilchrist, a forensic pathologist for the State of Alabama, testified he performed an autopsy on the victim's body on September 22, 1980. The body was markedly decomposed, and exhibited two stab wounds to the abdomen. The lungs were acutely inflated, indicating death by asphyxia. Additionally, the vaginal area indicated lacerations and extreme hemorrhaging, consistent with an attempt to have carnal knowledge of the victim. The doctor could not testify as to the exact cause of the asphyxia, but testified it could have been caused by drowning, smothering, strangulation, or traumatic compression of the victim's chest. The stab wounds appeared to have been inflicted after death. Dr. Gilchrist estimated that the body of the victim would have floated to the surface some eight to forty-eight hours after having been placed in the river.
Chris Wakin, the victim's eleven year old brother, testified that he along with the victim, appellant, and appellant's younger brother, Tim, went swimming together around 5:00 p.m. on the afternoon of September 20, 1980 at Lakeside Trailer Park. Afterwards, they decided to play hide-and-go-seek with Tim and Chris hiding from appellant and Wendy. Tim and Chris left the other two at the dock, while they headed for some sand pits. The two boys made various sets of tracks to illude Wendy and appellant, and then headed toward the highway. The boys saw Tim's grandmother and walked ahead of her along the highway. *Page 889 
They observed two women in front of Nita's Beauty Shop who were trying to start an automobile. They then started to return to the trailer park. The boys saw Wendy and Jody, the appellant, running and they hid behind some trailers. Tim and Chris later returned to the sand pit, but could not find Jody and Wendy. They then returned to their trailer homes in the park, where Chris' mother inquired as to Wendy's location. They told her Wendy was with Jody, and she instructed them to tell them to come home as it was getting dark. Some twenty-five minutes after they had seen Wendy, they heard Mrs. Wakin calling for Wendy and saw Jody coming over the fence at the horse pen and walking towards them. Mrs. Wakin asked Jody where Wendy was, and he replied he did not know, and that he thought she was with Chris and Tim. She told him that Chris and Tim said Wendy had been with Jody, and Jody then began to tell a story about Wendy being kidnapped. Chris Wakin testified Jody was the last person with whom he had seen his sister on September 20, 1980. He stated he had lived at the trailer park for about three months before this incident occurred.
John Wakin, the victim's father, recalled his wife entering their trailer about 7:00 p.m. on September 20, 1980 extremely upset over Jody's story of Wendy's disappearance. They got in their automobile and drove slowly through the trailer park calling for Wendy. After twenty minutes they returned home and called the Sheriff's Department. Mr. Wakin later heard Jody tell a deputy that he and Wendy had been approached by a man in an automobile and that he told Wendy to run. He ran, and the next thing he saw was that the vehicle had circled around and taken off in the other direction. He could not, however, see if Wendy was inside the automobile.
Janice Wakin, Wendy's mother, recalled the evening of Wendy's disappearance. Wendy had finished supper and gone out to play about 5:40 p.m. Around 6:45 Mrs. Wakin saw Chris and Timmy and she asked them where Wendy was and they told her she was with Jody. She instructed them to tell Wendy it was time to come home. At 7:00 when she had not returned, Mrs. Wakin went outside and began to call Wendy. She then saw Jody coming through the horse pasture casually walking towards her. She asked him where Wendy was and he said he did not know. Mrs. Wakin then told him Chris and Timmy said she was with him, and he began to tell her about a blue automobile whose occupant had tried to get Wendy to enter the vehicle. Jody told her he and Wendy ran along the highway in front of the beauty shop and then down the road going into the trailer park. When he turned around again, Wendy was no longer to be seen. Mrs. Wakin and her husband searched for Wendy in their automobile, and then returned home and called the authorities.
David Gainey, an investigator with the Sheriff's Department, responded to a call from John Wakin at the Lakeside Trailer Park on September 20, 1980. When he arrived he saw the appellant at the Wakin's trailer, accompanied by his mother and grandmother. Jody was not a suspect in the disappearance at that time. However, Officer Gainey took the following investigative statement from Jody when he arrived:
 "Wendy and I had been playing with her brother, Chris and my brother, Timmy, most of the day. About five P.M., Chris, Timmy and Wendy and I separated. Chris and Timmy wanted to play cops and robbers and let Wendy and I hunt them. Wendy and I went through the woods and came out on the highway below the trailer park. We had gotten some stickers in our feet and we sat down to get them out. A man came around the curve and stopped by us. He opened the car door and said, hey, come here. Wendy started to walk to the car. I told her to wait and the guy said, shut up brat. I told Wendy to let's go and we started to walk away. The guy followed us real slow. We started to run and just as we *Page 890 
got even with the sign to Lakeside, I cut between the fence and a tree. I ran on to the driveway, to the trailer park and stopped to look back for Wendy. I didn't see her. I didn't see the car either. I heard a car spin off and I saw the car spinning around and going back the way it had come from. I called Wendy and she didn't answer. I went looking for her, but could not find her. So I went and told her mother what had happened." (R. 317-318)
Jody also described the occupant of the vehicle to Officer Gainey, as well as the vehicle itself. The driver was a tall, slim white male with dark hair, a beard, and a scar on his right temple. The automobile was a medium shade of blue four door with Ford written in script on the rear quarter panel. The rear deck was carpeted and the arm rest was torn off one door. The vehicle's licence plate was yellow.
Officer Gainey stated the area was searched until midnight on September 20, and then the search began again the next morning. He observed a set of large and small footprints in a sand pit area that appeared to be proceeding together. During the course of the search on Sunday, September 21, Jody repeatedly asked Officer Gainey if the river would be dragged, and how long it would take a body to float. Sunday afternoon Officer Gainey had Mr. Bill Burt draw a composite photograph from the description given by Jody of the alleged kidnap suspect.
On Monday, September 22, 1980 Officer Gainey took Jody Potts into custody and brought him to the Sheriff's Office. Because Jody was a juvenile, Officer Gainey contacted District Judge Norris and requested that he appoint appellant an attorney. Attorney Ab Powell was appointed as appellant's counsel and came to the Sheriff's Office to advise the appellant before appellant was questioned by Officer Gainey. After having been read his Miranda rights in consultation with his attorney, appellant signed a waiver of rights form, and gave an oral statement to Officer Gainey, which Gainey transcribed. The statement appears in pertinent part in the record as follows:
 "We went to the trailer and Wendy saw Timmy and Chris in the woods between the end of the trailer park and the highway. And we ran into the woods after them.
 "My side started hurting and we had to stop before we could catch them. We were about the middle of the woods. I sat down and Wendy sat down a little ahead of me. When I got my breath back, Wendy asked if I wanted to race on to the highway, which we could see from where we stopped. We did. We got to the road about the same time. We got stickers in our feet where we came out of the woods. This was about dusk. We sat down to get the stickers out. A man in a blue Ford came around the curve and stopped by us. He opened the car door and said, hey, come here. Wendy started to walk to the car. I told her to wait and the guy said, shut up, brat. I told Wendy to let's go and we started to walk away. The guy followed us real slow. I told Wendy to run and we started to run. Just as we got even with the sign to Lakeside, I cut between the fence and a tree. I ran on to the driveway to the trailer park and stopped to look back for Wendy. I didn't see her. I didn't see her or the car either. I heard a car spin off and I saw the car spinning around and going back the way it had come. I called Wendy and she didn't answer. I went looking for her, but could not find her, so I went and told her mother what had happened.
 "The above statement is true and correct to the best of my knowledge. Nothing follows." (R. 356-357)
Appellant was placed under arrest at the close of this interview.
Officer Gainey testified that the law enforcement officials were never able to locate a vehicle meeting the description given by appellant. *Page 891 
Tommy Adams, Covington County Deputy Sheriff at the time of the incident, testified concerning footprints he observed during the search for Wendy Wakin. One large set of barefoot footprints led from the sand pit down to the water's edge on the bank of the river. Wendy's body was found floating in the river approximately forty feet down river from the point where the footprints were found.
Officer Ed Bundy testified he was present when the victim's body was removed from the river on Monday, September 22, 1980. He received custody of the body after it was placed in a body bag and maintained custody until Charlie Brooks from the state laboratory arrived and took custody of the body. He testified a very strong odor came from the body at the time he observed it.
Juanita McCormick testified she operated Nita's Style Shop, located in Gantt, Alabama, a short distance from Lakeside Trailer Park. She recalled being at her shop on Saturday afternoon, September 20, 1980. She and Jeanette Foshee were outside in front of her shop from 5:45 p.m. until 6:50 p.m. trying to get Ms. Foshee's automobile started. She testified she did not see Jody and Wendy running down the highway nor did she observe any blue automobile pass down the highway during that time period. She did hear a shrill scream and saw what appeared to be two to four children tussling down in behind her shop while they were trying to start the vehicle. Earlier in the day she had seen two young boys, both blond, walking down the highway, followed by an older woman.
Jeanette Foshee testified and corroborated the substance of Ms. McCormick's testimony.
Carolyn Owens Long, a former resident of Lakeside Trailer Park and neighbor of the appellant's family, testified that she saw the appellant run by her trailer at 1:30 a.m. on the morning of September 21, 1980 headed into the woods. She also saw him return from the same direction and run toward his trailer. She saw appellant again Sunday afternoon at which time he told her his family needed an automobile because they needed to get out of the area that night. Later that afternoon appellant came to her trailer and told her his mother had a boy friend whose father could defend him if he needed defending. Appellant returned to her trailer again Sunday night at 8:30 p.m. He was wet and had a terrible rotten odor about him. She allowed him to come in and sit in a straight chair. He kept his right hand inside of his shirt and his left hand in his pants pocket where he appeared to turn some object over and over. He stated he had been out looking for Wendy, and had what appeared to be scratches on his hand. He stayed and talked until a little after 10:00 p.m. at which time she told him to leave because she had to bathe her elderly aunt who lived with her. After he was outside, he asked her to come outside, and she refused. He asked her if she smelled anything and she said yes, it smelled like the horse lot. The appellant then replied that it was Wendy that she smelled. She asked him how he knew that, and he said it was because they were going to find her over there, and he indicated with his finger the location towards the river. He also told her to take her aunt to work with her the next day because "all hell is going to break loose tomorrow. They are going to find her right over there before lunch tomorrow." After he left, Ms. Long heard a noise and thought she saw the appellant in the front seat of her automobile. She did not see him any more that night. On Wednesday after the body was discovered on Monday, Ms. Long found a knife blade on her back porch steps, which she held until Officer Gainey came and picked it up from her the following Sunday.
After calling Deputy Richard White to testify concerning leaving a subpoena for Ms. Long with her aunt, the state rested. Appellant's motion to exclude the state's case was denied.
Jody Potts, testifying on his own behalf, denied that he killed or sexually molested *Page 892 
Wendy Wakin. He explained that a malformity of one of his hands was caused by a tractor injury when he was four years old. He was fifteen years old and had completed the sixth grade at the time of the trial. His family moved into Lakeside Trailer Park in September, 1980 before Wendy's disappearance on September 20, 1980. Jody told substantially the same story at trial concerning the kidnapping as he had related previously.
Theron Covin, a staff psychologist with the Southeast Alabama Youth Services, testified he had performed a psychological evaluation of the appellant. His tests indicated appellant was not psychotic. Appellant had a full scale I.Q. of 76, with 100 being an average I.Q., and a mental age of eleven years six months. Appellant was not, however, retarded in Mr. Covin's opinion. Mr. Covin also stated that the appellant had related the kidnapping story to him, but had changed it in one version to say the kidnapper chased them on foot, rather than in an automobile. Appellant also told Mr. Covin that he could remember hearing a girl scream and that the girl fell on some rocks, but he could remember nothing beyond that point. The defense rested at the close of Mr. Covin's testimony.
 I
Appellant contends the district court erred to reversal by allowing a transcription of testimony of a state's witness from a previous juvenile certification hearing into evidence in the preliminary hearing over appellant's objection. The transcription contained the testimony of Carolyn Owens Long and was introduced because Ms. Long's whereabouts were unknown at the time of the preliminary hearing, and only after the preliminary hearing had been continued once because of Ms. Long's absence. Appellant contends his constitutional right to confront witnesses against him was violated by the introduction of the transcription. As well, he argues that without Ms. Long's testimony the evidence introduced at the preliminary hearing was insufficient to hold him, and that he was unlawfully incarcerated without bond during the time between the preliminary hearing and the grand jury indictment. Finally, appellant asserts that because new additional counsel was appointed to represent him between the time of the juvenile certification hearing and the preliminary hearing, his counsel was denied the right to cross-examine the witness against him by the introduction of the transcribed testimony.
The state concedes in its brief that appellant had the right to confront witnesses against him at the preliminary hearing. The state does not, however, address the question of whether appellant's right to confront was protected by the manner in which the transcribed testimony was originally taken and subsequently introduced. Rather, the state relies on Duncan v.State, Ala.Cr.App., 369 So.2d 885 (1979), for the proposition that even where an appellant's statutory right to a preliminary hearing is infringed, no reversible error results where an indictment has been returned. The facts in Duncan, however, were precisely opposite to the facts in the instant case. InDuncan, the issue was, ". . . whether the failure to grant a preliminary hearing after indictment amounts to reversible on appellate review of the case." (Emphasis added). The court found it would be folly to reverse the case to allow a repetitious inquiry into probable cause. In the instant case, a preliminary hearing was in fact held prior to indictment, and the issue of an absolute right to a preliminary hearing was not in question.
The issue is whether when a preliminary hearing is held, does a possible procedural defect in that hearing mandate reversal, despite a subsequent finding of probable cause by a grand jury indictment.
There is no constitutional requirement in Alabama that there be two inquiries into probable cause. Duncan, supra; Ex ParteCampbell, 278 Ala. 114, 176 So.2d 242 (1965). Neither does constitutional due process require a preliminary hearing, *Page 893 
although Alabama by statute provides that if the accused makes a demand for a preliminary hearing within thirty days of his arrest, a hearing must be held within a reasonable time following his demand. § 15-11-1 Code of Ala. 1975; Nobis v.State, Ala.Cr.App., 401 So.2d 191, cert. denied, Ala.,401 So.2d 204 (1981). The appellant in the instant case was provided a preliminary hearing after making a demand for same on December 12, 1980. Appellant was arrested on September 22, 1980, and certified for trial as an adult on December 10, 1980. Hence, his demand came well after the thirty day time limit provided for under the statute. After a finding of probable cause by the district court on January 14, 1981, the appellant continued to be incarcerated without bond and was bound over for action by the grand jury, which indicted him in March of 1981.
The statutory thirty day time limit for making a demand for a preliminary hearing had long expired at the time appellant actually made his demand. The indictment by the grand jury satisfied all requirements for a finding of probable cause to proceed against the appellant. Duncan, supra. The possible harm to appellant arising out of the allegedly erroneously introduced evidence at the preliminary hearing would have come from a potentially unfounded finding of probable cause which could have caused a premature and unnecessary incarceration of the appellant in the time intervening between the preliminary hearing and the return of the grand jury indictment.
Therefore, the appellant's failure to demand a preliminary hearing within the 30-day statutory period waived his absolute right to a preliminary hearing. However, he was not prejudiced by virtue of his incarceration during the time period which lapsed before the return of the indictment by the grand jury because on October 10, 1980, a certification hearing was held at which time Ms. Long appeared and testified. Her testimony was transcribed and this transcription subsequently used at the preliminary hearing when after one continuance, it was determined that Ms. Long was not available at that time to testify. Further, there was a habeas corpus hearing held on December 10, 1980, which determined that the appellant was properly restrained and he was remanded to the sheriff to await the grand jury proceedings.
As we note here in this opinion, Ms. Long did appear at trial and was thoroughly cross-examined at that time. She was also fully cross-examined at the certification hearing held on October 10, 1980, prior to the grand jury proceedings. The appellant was represented by counsel in the certification hearing and also the preliminary hearing. We therefore find no error in this cause resulting from the use of a transcription of Ms. Long's testimony at the preliminary hearing.
 II
Appellant argues that § 13A-5-31 (a)(3) Code of Alabama 1975, under which he was indicted, was declared unconstitutional and rendered void by the United States Supreme Court's ruling inBeck v. State, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392
(1980). Hence he argues the offense for which he was indicted did not legally exist and his conviction is therefore a nullity and must be reversed. He further contends that the Alabama Supreme Court was without authority to judicially modify the statute to comport with the requirements of the United States Supreme Court's Beck decision. The Supreme Court of Alabama has held otherwise in Beck v. State, Ala., 396 So.2d 645 (1980) and we are bound by the decision of that court. Roynica v. State,54 Ala. App. 436, 309 So.2d 475 (1974), cert. denied, 293 Ala. 772, 309 So.2d 485 (1975), cert. denied 423 U.S. 858,96 S.Ct. 111, 46 L.Ed.2d 85 (1975). We find no error in appellant's prosecution under § 13A-5-31 (a)(3) as modified by Beck, supra. The trial and sentencing procedures outlined in Beck were followed by the trial *Page 894 
court and no error in this regard is apparent from the record.Clisby v. State, 6 Div. 576, Ala.Cr.App., this day decided.
 III
The appellant was fifteen years of age at both the time of trial and the time the crime was committed. Appellant argues that because the applicable code sections defining the sexual offenses of rape in the first degree and sexual abuse in the first degree, of a female who is less than twelve years old require that the assailant be sixteen years of age or older, he lacked the capacity to be guilty of the offense for which he was convicted. § 13A-5-31 (a)(3) defines the offense as the ". . . carnal knowledge of a girl under 12 years of age, or abuse of such girl in an attempt to have carnal knowledge, when the victim is intentionally killed by the defendant." The code sections applicable to carnal knowledge, or attempt thereof, of a female less than 12 years of age are as follows:
 "§ 13A-6-61. Rape in the first degree. (a) A male commits the crime of rape in the first degree if;
 (3) He, being 16 years or older, engages in sexual intercourse with a female who is less than 12 years old.
 "13A-6-66. Sexual abuse in the first degree. (a) A person commits the crime of sexual abuse in the first degree if:
 (3) He, being 16 years old or older, subjects another person to sexual contact who is less than 12 years old.
While the code sections defining these sexual offenses do not use the term carnal knowledge, the commentaries indicate the following:
 "Sections 13A-6-61, subdivision (a)(3), and 13A-6-62, subdivision (a)(1), supplant and are substantially the same as the present statutory rape sections, § 13-1-133, carnal knowledge of girl under 12, and § 13-1-134, carnal knowledge of a girl over 12 and under 16 years of age. Under the Criminal Code, it is a defense to both that the male is under 16 years of age; and § 13A-6-62 (a)(1) applies only if defendant be at least two years older than a female. Present law recognizes the male's immaturity only where the victim is over 12 but under 16. The age, immaturity and lack of judgment of the offender are the determining factors in establishing an absence of culpability, not merely the age of the victim. In any event, the juvenile courts retain jurisdiction of those cases involving youthful offenders which warrant action. § 13A-6-61
Commentary, Code of Ala. 1975, p. 113.
 "These sections also encompass the parts of the present carnal knowledge statutes, §§ 13-1-133 and 13-1-134, which punish abuse `in the attempt to have carnal knowledge.' The term `abuse' under those statutes contemplate injury to the genitalia or sexual organs." § 13A-6-66 commentary, Code of Ala. 1975, p. 118.
After careful scrutiny of the pertinent code sections, it appears to us to have been the legislative intent to provide as a defense to the above referenced crimes, formally denominated as carnal knowledge, the fact that the appellant is under 16 years of age. Does this require then, that a defendant charged under § 13A-5-31 (a)(3) be 16 years of age or older to be culpable for that offense? The state argues that it does not, contending that the definitional component of § 13A-5-31 (a)(3) carnal knowledge is supplied by § 13-1-133 Code of Ala. 1975, in that the death penalty code sections were carried forward intact from the 1975 code to the new criminal code, without any definitional changes. However, § 13-1-133 was specifically repealed by § 9901 of Acts 1977, No. 607, p. 812 (Criminal Code). The new Criminal Code which carried the death penalty statute forward became effective on January 1, 1980, after the repeal of § 13-1-133. Additionally, the policy of the legislature in the new code provides for taking into consideration the age, immaturity, and lack of judgment of an appellant *Page 895 
under the age of 16 years for sexual offenses. As well, the new code undertakes to define sexual offenses as a group under Chapter 6, Article 4. To hold that § 13A-5-31 (a)(3) creates its own sexual offense with a definition that disregards the appellant's age, may appear to controvene the apparent legislative policy of Chapter 6, Article 4, as well as recognizing § 13A-5-31 (a)(3) as creating a sexual offense not incorporated under Chapter 6, Article 4, which undertakes to define sexual offenses. However, it appears to us that the legislature intended to do exactly that by codifying separately those crimes it deemed worthy of capital punishment. As Justice Maddox stated in Beck, supra:
 "Without question, the legislature has spelled out specifically what offenses it considers to be capital offenses. The Alabama legislature has substantially followed the Model Penal Code in describing with specificity those offenses which are deemed capital offenses. Code 1975, § 13A-5-31. Each of the fourteen crimes specified requires an intentional killing with aggravation, and not some crime other than homicide under aggravated circumstances. Horsley v. State, Ala.Cr.App., 374 So.2d 363 (1978); aff'd, Horsley v. State, Ala. 374 So.2d 375 (1979), Ala., 396 So.2d 645 (1981)."
The legislative policy for protecting youthful offenders by weighing their immaturity and lack of judgment in committing sexual offenses has no place in determining the culpability of a defendant who has been determined to be an adult and responsible for the criminal conduct he has undertaken which resulted in a capital murder. To hold otherwise would create the anomalous situation of finding the appellant culpable for the intentional murder portion of the crime, but not culpable for the sexual offense attached to the same crime. We therefore hold that § 13A-5-31 (a)(3), patterned after repealed § 13-1-133, itself defines the aggravating sexual offense and purposefully does so without regard to the age of the defendant.
 IV
Appellant argues the trial court erred in failing to charge the jury as to the lesser included offense of manslaughter. The jury, in capital cases, must be instructed on each lesser included offense which has any basis in the evidence. Beck, supra. The trial judge instructed the jury as to the lesser included offense of murder, but refused to instruct as to manslaughter. We have reviewed the evidence in detail, and find no factual basis for instructing the jury as to manslaughter.
 V
Appellant's final contention is that the circumstantial evidence was insufficient to sustain the jury's verdict. For circumstantial evidence to be sufficient to sustain the jury's verdict, the circumstances proved must be consistent with the hypothesis of the defendant's guilt and inconsistent with the hypothesis of his innocence, as well as inconsistent with every other rational hypothesis except that of his guilt. Thomas v.State, Ala.Cr.App., 363 So.2d 1020 (1978). Circumstances, even of the strongest nature, which merely arouse a suspicion of guilt, are insufficient to serve as the foundation for conviction. Thomas, supra.
The evidence presented at trial proved that appellant was the last person with whom the victim was seen alive. Appellant's carefully detailed story of running down the highway to escape from the kidnapper was directly contradicted by two eye witnesses who were outside of the beauty shop before, during, and after the time of the alleged events detailed by appellant. They saw neither the two children nor the man and automobile described by appellant. Appellant made numerous incriminating statements to the neighbor, Ms. Long, including his statements made on Sunday after Wendy disappeared on Saturday, in which appellant said he needed an automobile to get out of the area immediately and that he had connections who could provide *Page 896 
him with a defense attorney if he needed one. Again on Sunday night he visited Ms. Long and was wet and smelled of a strong odor of decay. As the appellant left Ms. Long's trailer, he told her the odor was Wendy, and pointed towards the river where he said Wendy's body would be found the next day. During his visit with Ms. Long, he kept one hand hidden, and constantly rotated an object in his pocket with the other hand. One hand also appeared to be scratched. Testimony also indicated numerous inconsistencies in the kidnapping story told by appellant, including one version of the story in which the kidnapper chased Wendy and appellant on foot, rather than following them in an automobile.
We find that the state's evidence was sufficient to sustain the jury's verdict. Although the question is a close one, the incriminating statements made by appellant, when weighed in conjunction with the other surrounding facts and circumstances, preclude any reasonable hypothesis of appellant's innocence.
We have reviewed the entire record and find no error harmful to the substantial rights of appellant.
AFFIRMED.
HARRIS, P.J., and DeCARLO and BOWEN, JJ., concur.