LEIGH M. CLARK, Retired Circuit Judge.
This appellant was found guilty in a jury trial on an indictment that charged in pertinent part that he unlawfully sold, furnished or gave away “13.6 grams of marijuana, a controlled substance to Robert Sykes, contrary to and in violation of the Alabama Uniform Controlled Substance Act, in violation of Section 20-2-70 of the Code of Alabama.” He was sentenced by the trial court to imprisonment for ten years. By the brief of his counsel on appeal, the same attorney who represented him on the trial, two issues are presented.
By appellant’s first issue, his attorney contends that the State did not “prove proper chain of custody of substance alleged to be marijuana.” According to the testimony of Jefferson County Deputy Sheriff Robert Sykes, he was “working undercover in vice and narcotics on May 4, 1984, in cooperation with St. Clair Deputy Gary Ingram ... to make some drug buys.” On May 4, 1984, the two officers met in Pell City. They had an understanding with each other that Officer Sykes was to go to a “bar named Our Place off Highway 11.” Officer Sykes testified
that on that night “Just outside the bar entrance to Our Place” he had a conversation with Mr. Kenneth Battles, the defendant. A part of Officer Sykes’ testimony was as follows:
“Q. And what was said by you and what was said by him on the first time about 10:00 o’clock when you first saw him?
“A. I asked him if he had anything to smoke and he said he didn’t, but he could get something.

“Q. What, if anything, else was said?
“A. He said, come back in 30 minutes, and he would have it for me.
“Q. Did you in fact, come back in 30 minutes?
“A. It was a little bit longer, but, yes, sir, we did.
“Q. Is that when the second meeting and the second conversation took place?
“A. Yes, it was.
“Q. What, if anything, did you do after he told you he had it out in his truck?
“A. We walked around the side of Our Place to the truck.
“Q. All right. You say we, who, — was there more than you and he there?
“A. Yes, sir, there was an informant with us.
“Q. Okay. And, what, if anything, happened when you got back around to the vehicle?
“A. He opened the vehicle and reached inside the glove compartment and produced two plastic bags filled with marijuana.

“Q. What did you do after you gave Mr. Battles the money and took the bag he gave you?
“A. I went straight to my vehicle and left and went and met with Gary.

“A. I left, and they were behind me.
“THE COURT: Who was behind you?
“THE WITNESS: Deputy Ingram.
*1027 “Q. Where did the two of you go after that?
“A. We went to a crossroads close by. I don’t know exactly the name of it, but it’s not real far away.
“Q. After arriving there, what, if anything did you do?
“A. I took the bag of marijuana and I put it in an evidence envelope, he initialed, I initialed, and then he initialed it and we sealed it.
“A. All right. And what did you do with it?
“A. I gave it to Deputy Ingram.”
Thereafter, there was some confusing testimony as to the marijuana, by reason of the designation of State’s Exhibits, numbered 1 and 2, the first being a brown paper envelope and the other being the plastic bag of marijuana that was placed in the paper envelope, thereby causing references at times to No. 1 as the envelope without its contents and at other times to the envelope including the plastic bag of marijuana. We now quote from some of the additional testimony of Officer Sykes on direct examination:
“Q. Now, you will note on the top [of State’s Exhibit 1], it has been opened and initialed by some other parties; is that correct?
“A. Yes, sir.
“Q. But I’m going to ask another witness about that, but as far as it seems that you taped and the initials, it is unbroken and remains intact; is that correct?
“A. Yes, sir, it appears to be.
“Q. I’ll ask you at this time is State’s Exhibit No. 1 in the same or substantial condition as [sic] this time as it was when you turned it over to Mr. Ingram?
“A. Yes, sir, except for the other initials.
“Q. Except for the very end and some more initials on there; is that correct?
“A. Yes, sir.
“Q. Now,—
“MR. TEAGUE [Defendant’s Attorney]: Mr. Abbott, have you offered this?
“MR. ABBOTT: No.
“THE COURT: It’s not admissible at this time.”
The next witness called by the State was Officer Ingram, who testified in accordance with the testimony of Officer Sykes as to the time and places of their cooperative efforts on the night of May 4, 1984. He also testified as to the State’s exhibit containing the marijuana involved as follows:
“Q. What, if anything, did you do with this brown envelope and the contents of it after it was delivered by Deputy Sykes to you out there at the intersection of 231 and 11 that night?
“A. Okay. After we sealed it up, I carried it to the Department of Forensic Sciences in Jacksonville.
“Q. Who did you carry it to, please, sir? “A. Ron Hubbard.”
The next witness for the State was Ronald D. Hubbard, a forensic laboratory analyst and drug chemist employed with the Department of Forensic Science, who testified as to the chemical analysis and tests that he made as to the chemical composition of the substance contained in State’s Exhibit No. 2, stating that it constituted marijuana and weighed 13.6 grams. On cross-examination, Mr. Hubbard testified in part as follows:
“Q. And you testified that you have examined this material that was in this bag that came into the lab there at Jacksonville; is that correct?
“A. Yes, sir.
“Q. Okay. And do you recall the day that it came into your lab?
“A. Yes, sir. It was July 5th, 1984.
“Q. So some period of time, then, apparently lapsed. Are you aware when this event that is supposed to have occurred here, the date that this young man was alleged to have sold this?
“A. No, sir, I’m not.
“Q. Now, did you, yourself, receive this bag of marijuana or whatever it is on July 5th?
“A. Yes, sir.
“Q. You received it yourself?
*1028 “A. Yes, sir.
“Q. Okay. Did you go through any procedure documenting these things when they come in?
“A. Yes, sir.
“Q. What do you do?
“A. My secretary describes the envelope in the short report we have here, the receipt. And then I take the evidence and I place it in my evidence locker.
“Q. Okay. That’s what is generally done. What did you do with this?
“A. That, to my knowledge, is exactly what we did with this.
“Q. And you received it on July 5th; is that correct?
“A. Yes, sir.
“Q. 1984?
“A. Yes, sir.
“Q. Okay. When did you first perform any kind of tests at all on this substance?
“A. On the 23rd of July.
“Q. On the 23rd of July?
“A. Yes, sir.
“Q. What did you do on that day?
“A. I went through the procedures that I just described.
“Q. So you completed all these tests at one time; is that correct?
“A. Yes, sir.
“Q. And so it stayed there from— Where was this material from July the 5th until July the 23rd when you picked it up to analyze it?
“A. In my evidence locker.”
At the conclusion of the testimony of Mr. Hubbard and while the jury was given a “ten minute break,” the following occurred:
“MR. TEAGUE: Your Honor, we would move to exclude this particular piece of evidence that is claimed to be marijuana. We make that motion on the ground that there failed to be an accurate chain of evidence that has been established or linked in this case.
“THE COURT: In what respect?
“MR. TEAGUE: In respect that this arrest was made on May 4th, 1984. It was over two months before this substance was introduced or even tested. If it is the same substance, which I don’t think was shown beyond a shadow of a doubt that this is the same substance. And something could have occurred over that period of time that this could be a mistake. It could be some other substance that came in from somewhere else. I don’t think it has been shown the chain where this has moved step by step into the hands of this man.
“THE COURT: In what respect?
“MR. TEAGUE: Well, where has it been for two months, from May 4th until July 5th?
“THE COURT: Hasn’t there been testimony to that point?
“MR. TEAGUE: There has been some allusion to it.
“MR. ABBOTT: Your Honor, may I—
“THE COURT: Wait a minute. I’ll give you a chance to answer in just a moment.
“MR. ABBOTT: Judge, my point being is that is some argument he should have made when it was offered, not for a motion for a directed verdict or to exclude the evidence. It’s improper.
“THE COURT: I’m listening to you. But he has the floor right now.
“MR. TEAGUE: We will move for a directed verdict, and we feel that the State has failed to prove its case against this man.
“THE COURT: Do you want to respond?
“MR. ABBOTT: No, sir.
“THE COURT: All right. Then, overruled. I think the proper chain of possession has been shown in order for the Court to admit it into evidence at the time it was admitted.
“(Recess).
“THE COURT: All right. Court come to order. All right. Mr. Teague, who do you have?
“MR. TEAGUE: Kenneth Battles.”
Mr. Battles testified at length. He testified that he resided at “Route 2, Ashville,” that he was thirty years of age and had been a resident of St. Clair County since he *1029 was fourteen years of age, that on the evening of May 4, 1984, he and his wife “went to Our Place,” arriving there at approximately 8:00 o’clock. His testimony continued as follows:
“Q. Did anybody else go with you there?
“A. No, sir.
“Q. Okay. When you got there that night, what is the first thing that you did when you got there?
“A. Went in and got a table and ordered a drink.
“Q. Okay. Then what happened after that?
“A. They had a band playing. We danced. I might have shot a game of pool or two.
“Q. Okay. Did you happen to have any conversation with anyone other than your wife that night?
“A. I’m sure I did.
“Q. And do you have any idea who you had conversation with?
“A. Several different people, I’m sure.
“Q. Different people?
“A. (Witness nods head in affirmative manner.)
“Q. Were there a number of people there at the lounge that night?
“A. Yes, sir. It was full of people, it was full of people.
“Q. Did you know several people there?
“A. Yes, sir.
“Q. Okay. And, I guess there were some people there you didn’t know; is that correct?
“A. Yes, sir.
“Q. On that particular night, did you have occasion to see Mr. Robert Sykes there?
“A. I don’t remember ever seeing Mr. Robert Sykes.
“Q. Okay. Now, he was here and testified yesterday; is that correct?
“A. Yes, sir.
“Q. Had you ever seen him before yesterday?
“A. No, sir.
“Q. You never had seen him?
“A. Never had.
“Q. You didn’t see him up there that night on May 4th?
“A. No, sir.
“Q. Okay. Now, he testified that he had a conversation with you up there, or maybe with you in the hallway or the door, if I recall the testimony. Do you recall meeting anyone in that hallway and talking with anyone?
“A. No, sir.
“Q. Okay. Now, you have heard him say that he had a conversation with you and he wanted to know if you knew where he could get a smoke, I believe is the essence of what he said yesterday. Do you remember anyone saying that to you up there that night?
“A. No, sir.
“Q. Do you recall meeting with anyone in the parking lot that night at any time?
“A. No, sir.
“Q. Do you recall transacting or receiving any money for any material or marijuana or anything of that sort?
“A. No, sir.
“Q. Did you have any marijuana with you that night?
“A. No, sir.
“Q. And are you saying that you did not enter into any kind of transaction with this man that was here and testifying yesterday?
“A. No, sir.
“Q. Now, he testified — did you say that you didn’t go out in the parking lot with him or meet with him anywhere that night?
“A. No, sir.
“Q. And you are telling this Court that you have never seen that man?
“A. Yes, sir.
“Q. There has been certain evidence introduced that is alleged to be marijuana. I would like for you to take a look at, State’s Exhibit No. 2.
“A. (Witness complies.) Never seen it before.
“Q. You’ve never seen that material before?
*1030 “A. No, sir.
“Q. And you have never seen that man before?
“A. No, sir.
“Q. Did you see Gary Ingram that night?
“A. No, sir.
“Q. Okay. What time did you leave Our Place up there that night?
“A. It was probably a little after midnight.
“Q. And where did you go after that, if any place?
“A. Home.
“Q. And any time after that did you — I believe you testified, did you ever see that man any time after that date?
“A. No, sir.
“Q. Up until yesterday; is that correct?
“A. No, sir.”
Mrs. Sandra Battles, the wife of Kenneth Battles at the time of the alleged sale of the marijuana involved but who was divorced from him at the time of the trial, corroborated the testimony of Mr. Battles in detail as to his activities on the night of May 4,1984, between the time of their arrival at Our Place and their departure therefrom. She was cross-examined in detail by counsel for the State, in which she was asked, “But on this particular date, can you tell this jury he did not sell marijuana to an undercover agent outside the building by your parked truck?” She replied, “No, he didn’t.”
It is to be noted that the testimony on behalf of the defendant to the effect that he was not guilty of possessing or selling marijuana at or in the vicinity of Our Place on the night of May 4,1984, is in direct conflict with the testimony of the only person that testified that defendant was guilty of selling marijuana that night. In this state of the record, it was and is of paramount importance to know whether the vegetable material examined by Mr. Hubbard, whose qualifications as an expert on the subject are unquestioned, was the same substance that was delivered to him that was in the plastic bag, which plastic bag was in the brown paper envelope that both Mr. Hubbard and Officer Ingram say was delivered by Officer Ingram to Mr. Hubbard. The testimony of Mr. Hubbard as to this point cannot be reasonably reconciled with the testimony of Officer Ingram, inasmuch as Officer Ingram testified positively that it was delivered to Mr. Hubbard on the night of May 4, 1984, and Mr. Hubbard testified that it was delivered to him on July 5, 1984, and examined by him on the 23rd day of July, 1984. The only reasonable conclusion to be reached from this material difference between the testimony of Mr. Hubbard and Mr. Ingram as to the point is that the plastic bag and the vegetable material contained therein were not the same plastic bag and vegetable material that, according to the testimony of Officer Sykes, was sold to him on the night of May 4, 1984. It is understandable that the learned trial judge overruled defendant’s objection to the introduction into evidence of State’s Exhibit 1 and 2 in the light of much confusion in the testimony as to the two exhibits, but our reading of the transcript convinces us that the trial court was in error in permitting the admission in evidence of State’s Exhibit 1 and 2 and the expert testimony of Mr. Hubbard as to the contents of State’s Exhibit No. 2.
We realize that there is considerable merit in the position taken by counsel for appellee as to the issue now under consideration, which position is thus captioned in brief of counsel for appellee:
“APPELLANT’S OBJECTION TO THE CHAIN OF CUSTODY WAS NOT PROPERLY PRESERVED.”
In the argument of counsel for appellee on the point, a part of the transcript occurring during the direct examination of Ron Hubbard is quoted as follows:
“Q. And what is that opinion please, sir?
“A. It is marijuana.
“Q. And is that a controlled substance under the law of the State of Alabama?
“A. Yes, sir, it is.
“Q. Okay.
*1031 “MR. ABBOTT (Prosecuting Attorney]: At this time, Your Honor, the State would offer State’s Exhibit No. 1 and State’s Exhibit No. 2 into evidence.
“THE COURT: All right. Any objection?
“MR. TEAGUE: Yes, sir, we object very strongly.
“THE COURT: What are the grounds for your objection?
“MR. TEAGUE: Well, this material, I don’t think they actually linked it to my client’s case. The wrapper or package or whatever it was contained in is self-serving, and we would object to it coming into evidence.
“THE COURT: Overruled.
“MR. ABBOTT: Nothing further.
“(State’s Exhibits No. 1 and 2 received into evidence).”
We agree with appellee’s argument, with authorities to support it, “that specific objections are necessary to preserve error” and that the objection of defendant’s attorney was not as specific as it could have been, but up until that time during the trial of the case, it had not been shown that the expert witness, according to his testimony, did not receive the exhibits containing the controlled substance involved until two months after the alleged commission of the crime involved. It is further argued in brief of counsel for appellee as follows:
“Even if, arguendo, Appellant had properly preserved this objection for review, the trial court properly overruled Appellant’s motion to exclude, as this Court stated in Slaughter v. State, 411 So.2d 819 (Ala.Crim.App.1981) ‘(T)he evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain.’ ”
There are some striking similarities between the facts in Slaughter v. State and the facts in the instant case as to the chain of custody of the marijuana that was examined and tested by an expert chemist as to whether it constituted marijuana. However, there is a distinguishing difference between that case and this case, particularly in the fact that there was no conflict in the cited case in the testimony of the law enforcement officer who delivered the exhibit to the office of the “toxicologist” who examined it and the testimony of the expert at the toxicology office, who received and examined the same and testified as an expert that the material examined was marijuana, as shown by the following from the opinion of Judge DeCarlo in Slaughter v. State, at 411 So.2d 822:
“Deborah Sennett testified she received a package from Sheriff Sheffield at the forensic sciences office on January 22, 1981. She identified State’s Exhibit I as the same package that was delivered on January 22, 1981.”
The pivotal point involved in the issue under consideration in the instant case was not involved in Slaughter v. State.
The transcript of the proceedings does not contain any semblance of any effort to reconcile the testimony of Mr. Hubbard that he received the material he tested and found to be marijuana from Officer Ingram on July 5, 1984, with the testimony of Officer Ingram that he delivered it to Mr. Hubbard on the night of May 4, 1984. We are of the opinion that, in the absence of any evidence tending to reconcile the difference between the testimony of each other in the respect noted, the substance examined and tested by Mr. Hubbard and found to be marijuana was not the substance that Officer Sykes testified he bought from defendant on the night of May 4, 1984. Irrespective of the merit in the position taken by counsel for appellee that “Appellant’s objection to the chain of custody was not properly preserved,” we are led to believe that defendant’s attorney is not to be solely blamed for such delinquency on his part, in view of the confusing nature of the presentation of the evidence relative to the introduction in evidence of State’s Exhibits 1 and 2. Not until a long time after they were marked *1032 for identification and had been repeatedly referred to by the attorney for the State, as well as the attorney for defendant, and not until after the cross-examination of Mr. Hubbard, did a strong likelihood appear that the substances involved were not so linked together as to prove they were the same substances. We conclude that the trial court committed error prejudicial to defendant in not granting defendant’s motion to exclude the evidence as to the material contained in State’s Exhibit 2, which ruling by the trial court was thus stated:
“Then, overruled. I think the proper chain of possession has been shown in order for the Court to admit it into evidence at the time it was admitted.”
We do not say that the testimony of Officer Ingram with the testimony of Mr. Hubbard as to when Exhibits 1 and 2 were delivered to him by Officer Ingram is so irreconcilable as to show conclusively that the substance sold by defendant to Officer Sykes, according to the testimony of Officer Sykes, was not the same substance that Mr. Hubbard testified he tested and found to be marijuana, but there was no reconciliation thereof at any time on the trial of the instant case. It follows that the judgment of the trial court should be reversed.
By our conclusion reached as to the first issue presented by appellant’s counsel, it may seem unnecessary for us to pass upon the only other issue presented by appellant, which is stated in appellant’s brief as follows:
“Does the denial of the preliminary hearing by the Circuit Court, where Defendant was not afforded an opportunity to request such hearing at the District Cour,t level, deny Defendant due process of law under the Fifth and Fourteenth Amendments of the United States Constitution?”
Nevertheless, we proceed to do so, by stating that the record shows that appellant was indicted by the St. Clair County Grand Jury on January 11, 1985, and that, by his attorney, he filed a motion for a preliminary hearing on February 4, 1985, which motion was denied by the Circuit Court on February 11, 1985. We agree with counsel for appellee that his issue is “without merit” and that the law as to the point has been well stated by Judge Tyson in Copeland v. State, 455 So.2d 951, 955-956 (Ala.Cr.App.), cert. denied, 455 So.2d 956 (Ala.1984), as follows:
“It has long been the law in Alabama that a defendant ‘does not have an absolute right to a preliminary hearing.’ Duncan v. State, 369 So.2d 885 (Ala.Cr.App.1979); Potts v. State, 426 So.2d 886 (Ala.Cr.App.1982), affirmed, 426 So.2d 896 (Ala.1983). Furthermore, it is not necessary to have a preliminary hearing to satisfy the requirements for due process. Queor v. State, 278 Ala. 10, 174 So.2d 687 (1965); Scaife v. State, 337 So.2d 146 (Ala.Cr.App.1976); Duncan v. State, supra. Moreover, ‘[o]nce an accused has been indicted, no grounds for reversible error exists when the accused’s demand for a preliminary hearing is not satisfied.’ Duncan v. State, supra; Potts v. State, supra. Therefore, we hold that the appellant’s rights have not been abridged in this instance.”
For the error committed as stated above as to the first issue presented by appellant, the judgment of the trial court should be reversed and the cause remanded for action consistent with this opinion.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
BOWEN, P.J., and TYSON, PATTERSON and McMILLAN, JJ., concur.
TAYLOR, J., dissents.