[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 752 
Danny Joe Bradley was indicted for the capital murder of Rhonda Hardin, his twelve-year-old stepdaughter. A jury convicted him of two counts of a four-count indictment: murder during a rape in the first degree and murder during a sodomy in the first degree in violation of Alabama Code 1975, § 13A-5-40
(a)(3). After a sentence hearing, the jury unanimously recommended the death penalty. Following a presentence investigation, the trial court held a sentence hearing and sentenced Bradley to death by electrocution. Bradley raises eight issues on this appeal from that conviction and sentence. *Page 753 
 I
In sentencing Bradley to death, the trial court made written findings of facts. These findings are supported by the evidence.
"Upon consideration of the evidence and testimony presented before the Court during the guilt phase of the trial in this cause, the Court hereby finds as follows:
"Rhonda Hardin was a twelve year old female residing at 309 Barlow Street, Apartment B in Piedmont, Calhoun County, Alabama, on January 24, 1983. The family unit residing at the above address consisted of Rhonda Hardin, her younger brother, Gary `Bubba' Hardin, Judy Bradley, the mother of Rhonda and Gary; and the Defendant, Danny Joe Bradley, Judy's husband and Rhonda's and Gary's step-father.
"That on January 24th and 25th, 1983, Judy Bradley was absent from the home, having been hospitalized for some thirteen (13) days, and that the Defendant, Danny Joe Bradley, was the parental custodian of the minors, Rhonda Hardin and Bubba Hardin.
"The Bradleys (Defendant, Rhonda and Gary Hardin) were visited at their apartment on the evening of January 24, 1983, by Dianne Mobley, Jimmy Issac and Johnny Bishop who left around 8:00 p.m. and Bubba Hardin retired for the evening thereafter. When Bubba retired Rhonda was asleep on the couch in the living room. Bubba testified that Rhonda had asked him to wake her up so she could sleep in her bedroom but that Danny Bradley instructed him to leave Rhonda on the couch. Bubba testified that he was later awakened at some hour by the sound of a chair being `bumped' in the kitchen and heard the unlatching of the back door; that there were no lights on and no television sound on; that he fell back asleep and was later awakened by Danny who informed him that Rhonda was missing. Danny Bradley then took Bubba next door.
"Bubba testified that Danny Bradley would play a game both with Rhonda and Bubba by having them think of something `good' while Danny placed his hand on their necks and stopped the flow of blood to the brain until they were unconscious.
"Phillip Mannis resided in the adjoining duplex apartment at 309 Barlow Street and was awake watching TV until the morning hours of January 25th. At 12:50 a.m. Mannis testified that Bradley knocked on his door and stated that Rhonda Hardin was missing. Bradley told Mannis that he (Bradley) found Rhonda attempting to take some of her mother's prescription drugs; that they argued and he dozed off and on awakening found that Rhonda was gone. Mannis volunteered to help Danny Bradley find Rhonda. Danny told Mannis that he (Bradley) would first check at the house of Rhonda's grandmother (Bennett). The Defendant was gone from the Barlow Street location in his auto for ten to fifteen minutes, returned and reported to Mannis that Rhonda was not at her grandmother's house.
"Robert Roland, brother-in-law of the Defendant, testified that Danny Bradley arrived by auto at Roland's home at approximately11:30 p.m. and asked if he had seen Rhonda. When the Defendant was told `no' he walked a short distance to Ed Bennett's (his in-laws and the grandparents of Rhonda) returned and drove away.
"Ed Bennett testified that Danny Bradley arrived at his home `around midnight' looking for Rhonda and upon his failure to locate her left after ten to fifteen minutes.
"Police Officer Bruce Murphy testified that he saw the Defendant in his car on North Church Street at Ladiga Street at 9:30 p.m.
"Phillip Mannis testified that Danny Bradley returned to his Barlow Street apartment around 1:15-1:20 a.m. and stated that Rhonda was not at her grandparents (the Bennetts') and asked Mannis to go with him to the Piedmont hospital to see Judy Bradley. Because of the stated fear of little gasoline in his auto, Bradley and Mannis leave on foot to look for Rhonda at approximately 1:30 a.m. and arrive around 2:00 a.m. Bradley and Mannis wait at the hospital lobby for approximately an hour to *Page 754 
an hour and a half, as Bradley states he fears upsetting his hospitalized wife. Finally, Mannis relates to Judy Bradley that Rhonda is missing. The two men walk to the Piedmont Police Station and report the absence of Rhonda to Piedmont Police Officer Ricky Doyal at 3:30 a.m. Danny Bradley relates to the officer that he has argued with Rhonda at their home that evening, then fell asleep, and on awakening at approximately 11:30 p.m. discovered Rhonda was missing and went to his neighbors. Mannis and Bradley then walked back to the Barlow Street duplex apartment arriving between 5:00 and 5:10 a.m.
"The body of Rhonda Hardin was discovered in a wooded area approximately ten yards off McKee Street in Piedmont, Calhoun County, Alabama, at approximately 7:00 a.m. on January 25, 1983.
"At trial, evidence and testimony was produced to the effect that Rhonda Hardin was the victim of a homicide and that the death of the said Rhonda Hardin was asphyxia due to strangulation by the application of external pressure to the neck.
"The Court, from the evidence and testimony, further finds that the body of Rhonda Hardin, bore some evidence of sexual assault and that the autopsy performed indicated the presence of human semen in the vagina, rectum, mouth and gastric content of the victim.
"The Court further finds that the Defendant, Danny Joe Bradley, was transported by the police department vehicle to the Piedmont police station on January 25, 1983, at approximately 9:30 a.m. for routine questioning as the last known person to see the victim alive. At the police station the Defendant was fully advised of his legal rights and then indicated his desire to cooperate with the legal authority. During the course of that day, the Defendant consented to a search of both the apartment at 309 Barlow Street and his automobile. The Defendant further consented to the taking of his blood and saliva samples from his person as well as fingernail scrapings and a pubic hair sample. After extensive questioning throughout the day including a trip to Birmingham, Alabama, the Defendant went home to 309 Barlow Street approximately 4:00 a.m. on January 26, 1983.
Throughout the questioning of the Defendant by Piedmont City and State Law enforcement agents, the Defendant asserted that he had remained at his home until his discovery that Rhonda Hardin was absent.
"The Court further finds, from the evidence and testimony, that the defendant made the statement in the presence of Charlie Bennett and Russell Dobbs, in substance, `In my heart I know I done (sic) it'.
"The Court further finds, from the evidence and testimony, that the Defendant, Danny Joe Bradley, was a blood type `O' non-secreter and that the semen found in and on the body of the victim was consistent with that which would be deposited by the Defendant. Further, the seminal fluids taken from the body of the victim are consistent with seminal stains found on the bed sheets in the Defendant's apartment and found on a blanket taken by the Defendant from the Piedmont hospital three days before the disappearance of the victim; that the hair, fiber and fingernail scrapings evidence clearly tended to connect the Defendant with the victim's clothing worn when discovered, with the bed sheets and blanket found inside Defendant's apartment the next morning, and fibers from the trunk of Defendant's automobile were consistent with fibers from the victim's red corduroy pants.
"The Court further finds, from the testimony of the Defendant, that the Defendant stated he lied to the legal authorities when he stated he did not leave his apartment on the night of January 24, 1983, until after his discovery that Rhonda Hardin was missing. At trial, the Defendant testified that he left the Barlow Street apartment around 10:30 p.m. on January 24, 1983, with the intent to steal a car, located on the other side of Piedmont, that he took a boys 20 inch bicycle from a yard on Hughes Street, pedaled to his intended location but determined that his opportunity to take the intended auto was not good, and that he pedaled back, returning home around midnight *Page 755 
and discovered Rhonda Hardin was missing. The Defendant testified that he did not reveal this information earlier for fear of having his probation revoked."
 II
Bradley argues that the consent he gave to search his house and his statements to the police were the product of his illegal arrest and that, consequently, neither the physical evidence obtained from his house nor his statements should have been admitted into evidence. The resolution of this issue involves a number of related questions.
This Court must first determine whether Bradley was arrested or whether his situation was consensual. If an arrest occurred, the legality of that arrest must be determined. If the arrest was illegal, we must decide first, whether Bradley's consent to search and statements were voluntary within the confines of the Fifth Amendment, and, if so, then whether they were the tainted product of an illegal arrest and seizure. If Bradley was illegally arrested, this Court makes two determinations. First, whether the consent to search and the statements were voluntarily given within the meaning of the Fifth Amendment to the United States Constitution. If the consent and statements were voluntarily given, this Court must then determine whether each was sufficiently an act of free will to purge the primary taint of the illegal arrest. United States v. Wellins,654 F.2d 550, 552-53 (9th Cir. 1981).
 THE FACTS
The State's evidence shows that between 8:30 and 9:30 on the morning of January 25, 1983, approximately one hour after Rhonda's body had been discovered, four law enforcement officers arrived at Bradley's residence. Piedmont Police Officer Bruce Murphy and his partner, Officer Terry Kiser, were in plain clothes and driving a pickup truck. Piedmont Police Chief David Amberson arrived with Calhoun County Deputy Sheriff Don Glass in the Deputy's official car. Bradley was to be "picked up" for questioning because he was one of "quite a few" suspects. Officer Murphy and Chief Amberson were the only officers present that morning who testified at the suppression hearing or at trial.[1] Both denied informing Bradley that he was under arrest. Chief Amberson testified that Bradley was not under arrest, was not placed under guard, and was free to leave anytime he wanted. Murphy testified that Chief Amberson was "in charge", that he "was to make sure he [Bradley] was home" because Amberson was "en route to talk to him" and that he never said anything to Bradley and did not tell Bradley why he was being picked up.
Bradley testified that Piedmont Officers Kiser and Murphy actually told him he was "under arrest for suspicion of murder" and told him not to talk. Murphy "pushed him down against the trunk of the car and handcuffed" him, picked up his leg, looked at his foot, and told Kiser, "Yeah, that's the print we got." Bradley testified that he was frisked outside his house before he was placed in the patrol car.
The State's evidence is inexplicitly silent as to what actually occurred when Bradley was picked up. The State's evidence does not reflect any conversation between Bradley and the police at Bradley's residence. Chief Amberson handcuffed Bradley and placed him in the Sheriff's car. Bradley was taken to City Hall where the handcuffs were removed. Bradley was handcuffed because it was the usual policy of the Piedmont Police Department to handcuff "suspects being transported."
Bradley testified that, after he had been handcuffed and placed in a patrol car, Chief Amberson arrived and went into his apartment for two or three minutes. Amberson denied this. *Page 756 
Bradley was taken to the police station and uncuffed. The State's evidence shows that Bradley was not placed under guard while Bradley testified that he was. Bradley was not fingerprinted or photographed, contrary to the usual practice with felony suspects being arrested.
Bradley voluntarily waived his Miranda rights. Bradley testified that "they just told me if I felt I needed a counselor, you know, that they would stop until I had one. And I told him, `Well, nothing to hide (sic), I don't see where I should need counsel.'" He was first questioned at approximately 10:00 that morning. At that time, only routine background information was obtained (name, age, date of birth, address, and employment). Around 10:50 a.m., Sergeant Gregory Kiser obtained fingernail scrapings from Bradley.
At 11:08 that same morning, Bradley signed a written "permission to search" after Sergeant Danny Bradley had read the form to him and given Bradley the opportunity to read the form himself. Immediately above Bradley's signature on this consent form appears the following paragraph: "I am giving this written permission to these officers freely and voluntarily, without any threats or promises having been made, and after having been informed by said officer that I have a right torefuse this search and/or seizure." (Emphasis added.) Bradley testified that he signed the consent form because "Officer Murphy told me if I would cooperate that it would speed up the process and they could get through with me and, you know, go to somebody else." Bradley also testified that he was "upset" and "couldn't really answer" whether he consented to the search because of what Officer Murphy told him or because he desired to assist the police and knew that he did not have anything to worry about. Bradley denied being told that he had a right to refuge to sign the consent form.
A statement was taken from Bradley "sometime after noon and before about four" after his house had been searched. This statement was substantially the same as what Bradley had told Officer Doyle when he had reported Rhonda's disappearance. Additionally, at trial, Bradley's account of the events of January 24th and 25th was substantially identical to the statement he gave the police. At trial, Bradley testified that he told the police the "whole" truth "up to a point" and admitted that he had lied about being home all night and that he had in fact left his house before he discovered that Rhonda was missing.
The State's evidence shows that, on the afternoon of January 25th, Bradley voluntarily agreed to go to the Department of Public Safety in Birmingham where he was given a polygraph test, the results of which are not disclosed in the record. On cross examination, Bradley testified that he went voluntarily to Birmingham because he "knew [he] didn't have anything to hide and [he was] willing to cooperate." Bradley testified that he cooperated "as best he could." Bradley also testified that he cooperated because he did not have anything to hide and because he had been told that the sooner he cooperated the sooner he could leave.
 "Q [District Attorney]: Isn't it a fact that actually what happened on this occasion, that you cooperated with them because you felt like you didn't have anything to hide; is that not true?
"A [Bradley]: I knew I didn't have anything to hide.
 "Q. Right. So, you cooperated with them one hundred percent; did you not?
 "A. They told me if I cooperated, the sooner I cooperate, the sooner I get to leave."
Bradley was returned to his home at approximately 4:00 on the morning of January 26, 1983, approximately twenty hours after he had been picked up by the police. Chief Amberson testified that Bradley told him that he "didn't have anything to hide and wanted to stay there until he got it cleared up." Bradley was released without being charged or placed under bond.
Medical technologist James Griffith testified that on January 26th, the day Bradley *Page 757 
was returned home, Bradley "willingly" gave blood and saliva samples at the Piedmont Medical Clinic "about twelve o'clock" that day. Bradley testified that the police told him that he could either give them the samples or they would get a court order, so he said, "Well, I'll give it to you." At trial, Bradley testified that he gave the blood and saliva samples of his "own free will: They asked and I obliged."
The next day, January 27th, Bradley, while at his home, consented to a second search of his residence and signed a written permission to search. At that time, Mrs. Bradley was present and she gave the police a soiled pair of Rhonda's underwear.
Bradley returned to City Hall three or four times "under police escort." Bradley testified, "When they would come to pick me up, I just, you know, I would go." He was finally arrested after his indictment on March 22, 1983.
At the time Bradley was "picked up" in January of 1983, he was twenty-five years old and married. He had completed the tenth grade and worked as a carpenter and a mechanic. Bradley was no stranger to police and criminal procedure. His criminal history reveals a number of arrests. At the time of Rhonda's murder, Bradley was on probation from a 1982 conviction for burglary in the third degree.
 THE ARREST
The State failed to prove that Bradley consented to the police custody or that the arrest was legal.
This case falls within the ambit of Hayes v. Florida,470 U.S. 811 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), which clarifies the holdings of Dunaway v. New York, 442 U.S. 200,99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); United States v. Place,462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); Florida v. Royer,460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); and Davisv. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676
(1969). Hayes holds that probable cause is required for the "involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes, whether for interrogation or fingerprinting. . . ." Hayes, 470 U.S. at ___, 105 S.Ct. at 1647. "The Court held that the line between brief detention and full-fledged arrest is crossed when the police `forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes.'" United States v. Gonzalez,763 F.2d 1127, 1132 (10th Cir. 1985), quoting Hayes, 470 U.S. at ___,105 S.Ct. at 1647. "[R]easonable suspicion of crime is insufficient to justify custodial interrogation even though the interrogation is investigative." Royer, 460 U.S. at 499,103 S.Ct. at 1325. However, Hayes does not change the rule that "a voluntary trip to the police station for questioning does not implicate the Fourth Amendment." United States v. Webster,750 F.2d 307, 321 (5th Cir. 1984), cert. denied, 471 U.S. 1106,105 S.Ct. 2340, 85 L.Ed.2d 855 (1985); Cox v. State, 489 So.2d 612
(Ala.Cr.App. 1985).
Both at trial and on this appeal, it is undisputed that the Piedmont Police had no probable cause to arrest Bradley when they picked him up for questioning. Under Hayes, it is clear that Bradley was actually arrested because he was removed from his home, transported to the police station, detained, and interrogated.
The trial court made no specific findings in denying the motion to suppress. However, in its written order sentencing Bradley to death, the trial court found that "Bradley was transported by the police department vehicle to the Piedmont police station on January 25, 1983, at approximately 9:30 a.m. for routine questioning as the last known person to see the victim alive." This clearly qualifies as an arrest under Hayes
unless Bradley consented to accompany the police to the station for questioning. United States v. Williams, 604 F.2d 1102, 1124
(8th Cir. 1979) ("[T]he lawfulness of appellant's continued presence in the company of the police after the investigatory stop must be based upon either consent or probable cause, regardless *Page 758 
of whether appellant was formally arrested or involuntarily detained for further questioning.").
The State carries the burden of proving that consent was given freely and voluntarily. Bumper v. North Carolina,391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). "Consent must be proved by clear and positive testimony and must be unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion." United States v.Williams, 754 F.2d 672, 674-75 (6th Cir. 1985). Whether consent is in fact voluntary is "a question of fact to be determined from the totality of the circumstances." Schneckloth v.Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048,36 L.Ed.2d 854 (1973); United States v. Recalde, 761 F.2d 1448, 1453 (10th Cir. 1985). Within the totality of the circumstances, there are three specific factors to consider in determining whether the State has sustained its burden of proving that the consent was voluntary.
 "In determining the specifics necessary to sustain the burden of showing that consent was voluntary, this court has established a three-tiered analysis. First, there must be clear and positive testimony that the consent was unequivocal and specific. Second, the Government must establish that the consent was given without duress or coercion. Finally, we evaluate those first two standards with the traditional indulgence of the courts against a presumption of waiver of constitutional rights. See United States v. Abbott, 546 F.2d 883, 885 (10th Cir. 1977); Villano v. United States, 310 F.2d 680, 684 (10th Cir. 1962)." Recalde, 761 F.2d at 1453.
Likewise, in determining whether an individual has been seized or has voluntarily chosen to undergo police custody and interrogation, the totality of the circumstances must be considered.
 "[T]he surrounding circumstances must be considered by the trier of fact in determining whether an individual was `seized' or voluntarily chose to undergo a confrontation with and station house interrogation by police. Hicks v. United States, supra [127 U.S.App.D.C. 209, 382 F.2d 158 (1967)]. Some relevant factors to be considered are (1) whether police gave the individual the option of accompanying them to the station for investigation. Fuller v. United States, 132 U.S.App.D.C. 264, 407 F.2d 1199 (1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969); (2) whether the individual was specifically told he was not under arrest. United States v. Brunson, 549 F.2d 348 (5th Cir.), cert. denied, 434 U.S. 842, 98 S.Ct. 140, 54 L.Ed.2d 107 (1977); and (3) whether a reasonable person in the suspect's shoes would have thought he was under arrest. Hicks v. United States, supra." Bridges v. United States, 392 A.2d 1053, 1056
(D.C. 1978), cert. denied, 440 U.S. 938, 99 S.Ct. 1286, 59 L.Ed.2d 498 (1979).
The record does not show whether the police gave Bradley the option of accompanying them to the station for investigation. While there was testimony by Chief Amberson that Bradley was not told that he was under arrest, there is absolutely no testimony whatsoever that Bradley was given any alternative to accompanying the police.
The evidence does show that Bradley was never told that he was not under arrest. Officer Murphy testified that he did not tell Bradley why he was being picked up. Chief Amberson did not testify to anything he said to Bradley. He only stated that he did not tell Bradley that he was under arrest. Murphy and Amberson were the only officers to testify that were present when Bradley was picked up.
The significance of what the officers actually told Bradley when they picked him up for questioning cannot be underestimated in determining whether or not an arrest actually occurred or whether Bradley consented and voluntarily agreed to accompany the officers.
 "[O]nly exceptionally clear evidence of consent should overcome a presumption that a person requested to accompany an *Page 759 
agent to an office no longer would feel free to leave. Such a request combines a substantial intrusion on an individual's freedom, a marked increase in the coercive nature of the environment in which the individual will be responding to police, and substantial psychological coercion from the intimation that there is strong suspicion that an individual is involved in a criminal act. Silently following an officer would rarely constitute sufficient evidence of consent under almost any circumstances." United States v. Berry, 670 F.2d 583, 598 (5th Cir. 1982).
See also State v. Bailey, 417 A.2d 915, 918 (R.I. 1980) (Where police officer apprised defendant that he was wanted in connection with rape investigation and asked defendant to accompany police to station, and police did not attempt to question the defendant before asking him to leave with them, nor did they inform him that he was not under arrest or that he was free to remain at home, the defendant was "arrested" in his apartment when the police asked him to accompany them to the police station.).
Finally, the circumstances of this particular case as contained in the record convince us that a reasonable person in Bradley's shoes would have thought he was under arrest when he was handcuffed and placed in the sheriff's patrol car. There is no evidence that Bradley was told why he was handcuffed, that he was not under arrest, that he was free to leave, that he could meet the police at the station or that he could come at another time.
Generally and except in the most exceptional circumstances, a person must be considered under arrest once he has been handcuffed. People v. Calhoun, 73 A.D.2d 972, 424 N.Y.S.2d 247
(1980); People v. Galloway, 89 Misc.2d 435, 437, 391 N.Y.S.2d 798,800 (Sup.Ct. 1977); Commonwealth v. Roscioli,240 Pa. Super. 135, 137, 361 A.2d 834, 835 (1976). The handcuffing of an individual without explanation amounts to a show of official authority such that "a reasonable person would have believed he was not free to leave." United States v.Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877,64 L.Ed.2d 497 (1980).
 "We have shoved many an analysis through the eye of a needle, but we cannot cope with the enormity of the incongruity urged by respondent in saying that a person who is handcuffed and asked to accompany an officer, freely consents to do so. Nor can we conceptualize that a person in this position believes that he or she is free to leave the area of detention. The act of handcuffing unequivocally manifests police restraint regardless of the suspect's supposed consent to the procedure." People v. Campbell, 118 Cal.App.3d 588, 596, 173 Cal.Rptr. 442, 446 (Cal.Ct.App. 1981).
In denying Bradley's motion to suppress, the trial court quoted from Justice White's opinion in Florida v. Royer,460 U.S. at 506-07, 103 S.Ct. at 1329:
 "We do not suggest that there is a litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop. Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment."
From the arguments presented to the trial court, its comments and ruling denying the motion to suppress, this Court can only conclude that the trial court found that Bradley consented to the encounter with the police. It is easy to conceive that Bradley would have voluntarily accompanied the police and cooperated with the investigation after having informed them of Rhonda's disappearance. Yet, while this argument is not untenable, given proper proof, it is not supported by the evidence. It is difficult to see how the trial court could determine that Bradley consented to being *Page 760 
"picked up for questioning" given the absence of any testimony from the police about what they told or asked Bradley during this confrontation and the nature of his response. Even if we assume that the trial court did not believe Bradley's testimony, the State's evidence does not show that the prosecution carried its burden of proving that Bradley freely and voluntarily consented to accompany the police. The evidence is simply insufficient to support such a finding. Consequently, we must conclude that Bradley's arrest was without his consent and illegal because it was without probable cause.
 FIFTH AMENDMENT VOLUNTARINESS
Before determining whether Bradley's consent to search and his statements were tainted by his illegal arrest, we must first determine their voluntariness. "The fact of custody does not itself negate voluntariness." United States v. Alfonso,759 F.2d 728, 741 (9th Cir. 1985); Wellins, 654 F.2d at 554 (The per se position that consent cannot validly be given where the defendant is the subject of an illegal arrest and search is improper and is an incorrect legal standard.). Fifth Amendment voluntariness is "merely a `threshold requirement' for Fourth Amendment analysis." Dunaway v. New York, 442 U.S. 200, 217,99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979). "[T]he `voluntariness of the statement is a threshold requirement'; this is obviously so, for absent voluntariness the statement can be suppressed without resort to any fruits analysis." W. LaFave and J. Israel, 1 Criminal Procedure 743-44 (1984).
The State shoulders the burden of proving this issue. Exparte Callahan, 471 So.2d 463, 464 (Ala. 1985). "[I]n attempting to prove voluntary consent following an illegal arrest, the government bears a heavier burden than when consent is given after a legal arrest." United States v. Cherry,759 F.2d 1196, 1210 (5th Cir. 1985). "The state bears the burden of proving, by clear and positive testimony, that the consent was, in fact, freely and voluntarily given. The testimony must prove there was no duress or coercion, either express or implied, and that the consent was specific, unequivocal, and freely and intelligently given." Coots v. State, 434 So.2d 864, 867
(Ala.Cr.App. 1983).
"[T]he question whether a consent to search was in fact `voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." Schneckloth v. Bustamonte,412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48, 36 L.Ed.2d 854 (1973); See also State v. Pybus, 480 So.2d 66 (Ala.Cr.App. 1985).
 "To determine whether a defendant's consent was voluntary, a court must look to the totality of all the circumstances. [Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48, 36 L.Ed.2d 854
(1973)]. Also, `[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.' Id. This Court has identified six factors, `none of which is . . . controlling,' which a court is to take into consideration in determining whether a defendant's consent to a search was voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found. United States v. Phillips, 664 F.2d [971] at 1023-24." United States v. $64,000.00 in U.S. Currency, 722 F.2d 239, 245 (5th Cir. 1984).
Excluding any taint or infection flowing from the apparent illegality of Bradley's arrest, the record supports the trial court's finding that "[a]t the police station the Defendant was fully advised of his legal rights and then indicated his desire to cooperate with the legal authority." Although this finding was made on conflicting evidence, the trial court's "credibility choices *Page 761 
at suppression hearings are binding on this court." UnitedStates v. Aldridge, 719 F.2d 368, 373 (11th Cir. 1983). "The trial court's finding [of the voluntariness of the consent to search] will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the weight of the evidence." Coots v. State, 434 So.2d 864, 867
(Ala.Cr.App. 1983). We indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence. The trial judge was in a better position to judge thereof than this Court having seen the witnesses, observed their demeanor, and heard them testify. Sullivan v. State,23 Ala. App. 464, 465, 127 So. 256, 257 (1930). In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court. Additionally, if the trial court's ruling is correct for any reason, it will not be reversed because the trial court assigned the wrong reason. Harnage v. State, 290 Ala. 142, 144,274 So.2d 352, 354 (1972).
Here, Bradley indicated his consent to the search by signing a consent to search form after he had been advised of his constitutional rights under Miranda and after having been informed that he had the right to refuse the request to search. Although not dispositive on the question of voluntariness, "such knowledge was highly relevant to the determination that there had been consent." United States v. Mendenhall,446 U.S. at 558-59, 100 S.Ct. at 1879, 64 L.Ed.2d 497. See also UnitedStates v. Morgan, 725 F.2d 56, 58 (7th Cir. 1984). "[P]roof by the prosecution that the consenting party was warned of his rights or that he was aware of his [Fourth Amendment] rights is often a significant factor leading to a finding that the consent was voluntary." W. LaFave, 2 Search and Seizure § 8.2 (i) at 670-71 (1978). "The fact that the Miranda warnings were
given is often cited as a circumstance contributing to the conclusion that the consent to search subsequently given was voluntary, although as with a warning of Fourth Amendment rights it cannot be said that the giving of the warning inevitably compels such a conclusion." 2 Search and Seizure § 8.2 (i) at 673. See also United States v. Smith, 543 F.2d 1141,1146 (5th Cir. 1976), cert. denied, 429 U.S. 1110,97 S.Ct. 1147, 51 L.Ed.2d 564 (1977); Hollander v. State, 418 So.2d 970,972 (Ala.Cr.App. 1982).
We have no difficulty in determining that Bradley's statements were voluntary within the context of the Fifth Amendment. The record shows that he knowingly, intelligently, and voluntarily waived his rights under Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgment." Williams v. State,461 So.2d 834, 838 (Ala.Cr.App. 1983), reversed on other grounds, 461 So.2d 852 (Ala. 1984).
Considering the evidence in the light most favorable to the trial court's determination of voluntariness, this Court finds that the weight of the evidence supports the trial court's determination of voluntariness of the consent to search and the statement.
 FOURTH AMENDMENT ATTENUATION
However, it is impossible to consider the voluntariness of Bradley's consent to search and his statement apart from his illegal arrest.
 "In order to be admissible into evidence, a confession must satisfy the requirements of both the Fourth and Fifth Amendments to the Constitution of the United States. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694
(1966). A confession must be voluntary, both in the sense that it was not the product of an illegal detention, Dunaway, Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), and *Page 762 
in the sense that it was obtained only after an intelligent, knowing, and voluntary waiver of constitutional rights. Miranda. A confession which is voluntary for purposes of the Fifth Amendment under Miranda does not necessarily satisfy the voluntariness requirement of the Fourth Amendment that the confession was not obtained by exploitation of the illegality of an arrest. Dunaway, 442 U.S. at 217, 99 S.Ct. at 2259, 60 L.Ed.2d at 838-39; Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416
(1975). Fifth Amendment voluntariness is `merely a "threshold requirement" for Fourth Amendment analysis.' Dunaway, 442 U.S. at 217, 99 S.Ct. at 2259, 60 L.Ed.2d at 839. `[S]tatements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will.' Florida v. Royer, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229, 238 (1983)." Cox v. State, 489 So.2d 612
(Ala.Cr.App. 1985).
In order for a statement or a consent to search given after an illegal arrest to be admissible, the State must prove two things: that the statement and consent are voluntary for purposes of the Fifth Amendment, and that they were not the product of the illegal seizure. These two tests are distinct and independent even though they may overlap. 2 Search andSeizure § 8.2 (d) at 650.
The attenuation doctrine is an exception to the exclusionary rule. This doctrine does "not hold all evidence is `fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is `whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."' Wong Sunv. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 417,9 L.Ed.2d 441 (1963). "[E]vidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is `so attenuated as to dissipate the taint,' Nardone v. United States, supra, 308 U.S. [338] at 341, 60 S.Ct. [266] at 268 [84 L.Ed. 307 (1939)]." Segura v.United States, 468 U.S. 796, 104 S.Ct. 3380, 3386,82 L.Ed.2d 599 (1984).
Consequently, a confession following an illegal arrest may properly be admitted into evidence where the statement meets the Fifth Amendment standard of voluntariness and is sufficiently an act of free will to purge the primary taint of the Fourth Amendment violation. Brown v. United States,422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Dunaway v. NewYork, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979);Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314
(1982). This same rule applies to a consent to search. UnitedStates v. Robinson, 625 F.2d 1211, 1219 (5th Cir. 1980); 2Search and Seizure § 8.2; Annot., 9 A.L.R.3d 858 (1966). "[I]n addition to proving voluntariness, the government must show a sufficient break in events to undermine the inference that the consent to search [or statement] was caused by the Fourth Amendment violation." Cherry, 759 F.2d at 1210-11.
In its written findings upon sentencing Bradley to death, the trial court found:
 "The Court further finds that the Defendant, Danny Joe Bradley, was transported by the police department vehicle to the Piedmont police station on January 25, 1983, at approximately 9:30 a.m. for routine questioning as the last known person to see the victim alive. At the police station the Defendant was fully advised of his legal rights and then indicated his desire to cooperate with the legal authority. During the course of that day, the Defendant consented to a search of both the apartment at 309 Barlow Street and his automobile. The Defendant further consented to the taking of his blood and saliva samples from his *Page 763 
person as well as fingernail scrapings and a pubic hair sample."
By focusing on Bradley's consent at the station and in apparently not considering whether he had been unlawfully seized, the trial court misapplied the United States Supreme Court decisions governing this issue and subjected itself to the same criticism advanced against the district court inUnited States v. Recalde, 761 F.2d 1448 (10th Cir. 1985), that the court did not make its finding in light of the requirement that any consent be free from the taint of the illegal detention.
 "The Supreme Court has consistently held that evidence obtained after an illegal arrest or seizure must be suppressed as the fruit of the illegal detention. See Hayes, 470 U.S. at ___, 105 S.Ct. at 1645; Royer, 460 U.S. at 507-508, 103 S.Ct. at 1329-1330; Dunaway, 442 U.S. at 216-19, 99 S.Ct. at 2258-60; Davis, 394 U.S. at 724, 89 S.Ct. at 1396. There is, however, no per se rule prohibiting use of such evidence, and a defendant's consent may, under certain circumstances, remove the taint of an illegal detention. See Dunaway, 442 U.S. at 216-17, 99 S.Ct. at 2258-59; Brown v. Illinois, 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975); see also United States v. Troutman, 590 F.2d 604, 606 (5th Cir. 1979); United States v. Ballard, 573 F.2d 913, 916 (5th Cir. 1978); cf. United States v. Davis, 456 F.2d 1192, 1194 (10th Cir. 1972). Voluntariness is a question of fact to be determined from the totality of the circumstances, Schneckloth, 412 U.S. at 227, 93 S.Ct. at 2047, and we accept the trial court's finding unless it is clearly erroneous, Cooper, 733 F.2d at 1364. When attempting to establish that there was voluntary consent after an illegal stop, however, the Government has a heavier burden to carry than when the consent is given after a permissible stop. Troutman, 590 F.2d at 606; Ballard, 573 F.2d at 916.
 "Moreover, when consent is obtained after an illegal arrest, the Government must establish a break in the causal connection between the illegality and the evidence thereby obtained. Dunaway, 442 U.S. at 217-18, 99 S.Ct. at 2259-60; Brown, 422 U.S. at 602-605, 95 S.Ct. at 2261-2263. An alleged voluntary act must be `sufficiently an act of free will to purge the primary taint' of the illegal detention. Id. at 602, 95 S.Ct. at 2261 (quoting Wong Sun v. United States, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)).
 "The record indicates that the district court found the consent at the station to be voluntary without considering whether Recalde had been unlawfully seized and detained. The court therefore did not make its finding in light of the requirement that such consent be free from the taint of the illegal detention. Because of this, and because the illegal nature of Recalde's seizure and detention are critical, we conclude that the district court's finding of consent is clearly erroneous." Recalde, 761 F.2d at 1457-58.
Despite this apparent misapplication of the governing legal principles by the trial court, we find that the record does provide sufficient information to justify the admission of Bradley's statement and the evidence found at his residence.
Upon examining the totality of the circumstances in this particular case, we are convinced that Bradley's illegal arrest did not taint his voluntary and freely given statements. It is the very totality of all the circumstances which compels this conclusion.
It was Bradley himself who first notified the police of Rhonda's disappearance. Bradley gave an account of his actions both before and after the child's disappearance to Officer Doyle before her body was discovered. Bradley confirmed this account to the police after he had been "picked up for questioning." At trial, Bradley again affirmed the truth of his statement with the exception of his admission that he had not been at home all night before he discovered Rhonda's absence as he had told the police. *Page 764 
Once at the police station, Bradley fully cooperated "as best he could," stating that he "wanted to stay there until he got it cleared up." After having been returned home, Bradley voluntarily gave blood and saliva samples at a hospital and consented to a second search of his residence. We cannot place much significance on the fact that Bradley returned to the police station three or four times for questioning simply because the record shows only that Bradley was "escorted" by the police on each occasion.
Bradley was in fact acting the part of a "cooperating, aggrieved" father concerned about his stepdaughter's disappearance. Thompson v. McManus, 512 F.2d 769, 771 (8th Cir.), cert. denied, 421 U.S. 1014, 95 S.Ct. 2421,44 L.Ed.2d 683 (1975). His consent to search and his statement were obviously given "with the hope that his cooperation would result in his elimination as a suspect in the case" and Chief Amberson testified that Bradley told him that he wanted to get it "cleared up". Commonwealth v. Harris, 387 Mass. 758, 766,443 N.E.2d 1287, 1293 (1982). A significant, but not controlling, factor to consider in examining the totality of the circumstances to determine voluntariness is whether or not the accused initiated the original contact with the police.State v. Douglas, 123 Wis.2d 13, 14-15, 365 N.W.2d 580, 582-83
(1985) (The accused implied consent to a search of his home after he telephoned the police and reported his location and that he had killed everyone.). See also State v. Fredette,411 A.2d 65, 70 (Me. 1979) (Accused's consent to search was not the product of police coercion where the accused initiated the presence of the police through her urgent telephone calls and continually cooperated with them.); Lewis v. State,285 Md. 705, 718-19, 404 A.2d 1073, 1080 (1979) (One of factors in finding consent to search was fact that accused summoned police after returning to house where slain bodies of wife and daughter were located.); Kelly v. State, 75 Wis.2d 303, 313,249 N.W.2d 800, 805 (1977) (Where the accused had the police called and implied that the victim had either shot himself or had been shot by a third person, "there was an implied consent not only to aid the victim but to determine what had caused the death or injury and who was responsible.").
Bradley had a reason to impress upon the police the fact that he was cooperating with their investigation. "[I]nformation tending to show why the person, at the time of the consent, believed it advantageous to cooperate with the police is also highly relevant." 2 Search and Seizure § 8.2 (9) at 660.
 "Even when the person allegedly consenting is later a defendant in the criminal prosecution, there may still be available evidence why he had reason to give consent and thus impress upon the police the fact that he was cooperating with their investigation. . . . Another [such situation] is that in which it appears the defendant decided to adopt a cooperative posture in the mistaken belief that he could thereby divert or prevent police suspicion of him." 2 Search and Seizure § 8.2 (9) at 661.
Having informed the police of Rhonda's disappearance, having told them that he and Rhonda had had an argument earlier that particular evening, and having led the police to believe that he was the last known person to have seen Rhonda before she disappeared, Bradley had placed himself in such a posture that he could hardly afford to do anything but fully cooperate with the police without centering suspicion on himself. Apart from this practical and common sense approach to the voluntariness questions there are sufficient and adequate "legal" grounds for finding that Bradley's consent and statements were not products of the illegal arrest.
Here, this Court finds that Bradley's statement to the police was not obtained by exploitation of the illegal arrest becausebefore his arrest Bradley had voluntarily appeared at the police station and given the police the substance of the statement he made after his arrest. In People v. Emanuel,98 Mich. App. 163, *Page 765 295 N.W.2d 875 (1980), cert. denied, 459 U.S. 1220, 103 S.Ct. 1226,75 L.Ed.2d 461 (1983), the Court held that the defendant's confession was not obtained by exploitation of his illegal arrest because before his arrest the defendant had indicated an intention to turn himself in and to speak to the police about the crime and had actually made a statement which contained the essence of his subsequent post-arrest confession.
After concluding that the defendant's arrest was illegal because it was made without probable cause, the Michigan Court concluded:
 "However, this alone does not per se require the suppression of the statement made by defendant to the police on July 25. Under Fourth Amendment rubric, the confession must be excluded from evidence only if it was obtained by exploitation of the illegal arrest, i.e., if it was the product of the illegal arrest. Brown v. Illinois, supra, 422 U.S. 603, 95 S.Ct. 2261, Dunaway v. New York, supra, 442 U.S. 216-218, 99 S.Ct. 2258-2259. The focus is on the causal nexus between the illegality and the confession, or, to put it another way, the question is whether the connection was sufficiently attenuated to permit the use at trial of the evidence obtained during the period of illegal detention: whether the statement was purged of its primary taint. Brown, supra, 422 U.S. 602-604, 95 S.Ct. 2261-2262. Dunaway, supra, 442 U.S. 217-218, 99 S.Ct. 2258-2259, and the cases cited therein.
 "Brown sets out a number of factors which are relevant in determining the admissibility of a confession obtained while a defendant is illegally detained:
 "`The question whether a confession is the product of a free will under Wong Sun [v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)] must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution.' (Footnotes and citations omitted.) Brown, supra, 442 U.S. 603-604, 95 S.Ct. 2261.
 "While not expressly enumerated as a factor worthy of consideration, we find that any antecedent circumstances, i.e., events transpiring prior to the `arrest', may well be relevant to the question of whether the statement should be excluded. We do not perceive an intention by the Court to make the factors listed in Brown exclusive and/or exhaustive.
"The voluntariness of the confession in a Fifth
 Amendment sense is not directly challenged. However, as Brown points out, the Fourth Amendment question is whether the statement is `sufficiently' an act of free will so as to purge the primary taint of the unlawful arrest. Brown, supra, 599, 95 S.Ct. 2259. Phrased another way, we must determine if the confession was obtained by means sufficiently distinguishable to be purged of the primary taint. That is why the giving of the Miranda warnings, although a factor operating in favor of admissibility under Brown, is not alone dispositive of the causal nexus question.
 "Militating against admissibility was the temporal proximity between the arrest and the confession as well as the fact that there was no intervening event of significance whatsoever. So too, as in Brown, the arrest of defendant without probable cause therefor had a `quality of purposefulness' about it, although it was *Page 766 
much less of a `fishing expedition' for evidence than the police actions were in that case, and surely less flagrant misconduct. Dunaway adds little to this analysis, as the Court therein characterized that case as `virtually a replica of the situation in Brown'. Dunaway, supra, 442 U.S. 218, 99 S.Ct. 2259.
 "What we find to be the factor which distinguishes the case at bar from Brown and Dunaway is the conversation involving defendant that took place prior to his arrest and confession, which, in our opinion, operated to sufficiently attenuate any causal connection between the arrest and the giving of the inculpatory statement by defendant so as to justify the admission of the confession in evidence at trial. The necessary nexus was not present because, as we see it, the quintessential variable which compelled or motivated defendant to make a confession was his earlier discussion with his cousin and Lieutenant Stewart, at which time he made a statement which contained the essence of his later July 25 confession, plainly was made of defendant's own volition, without the inherent coercion of a custodial environment or any other compunction, and was told to a police officer defendant had never previously met. Also supportive of his conclusion is defendant's statement to the Taylor Police at the time he was first approached by them, to the effect that he had intended to come speak with them but had not yet done so. More importantly, defendant, immediately following his conversation with Lieutenant Stewart, had expressed an intention to turn himself in to the Taylor police while accompanied by counsel.
 "We find these circumstances to be sufficient to satisfy the prosecution's burden of showing that the custodial statement given by defendant to the Taylor police on July 25 was sufficiently an act of free will to justify admission, i.e., that the confession was not obtained by exploitation of the illegal arrest under the standard announced in Brown and explicated in Dunaway." Emanuel, 98 Mich.App. at 176-79, 295 N.W.2d at 881-82.
Bradley's statement was taken at least two and one-half hours after he had been picked up, after he had been twice warned of his Miranda rights, and after he had signed a consent to search his residence. We do not view the police misconduct as especially flagrant. Although Bradley was considered a suspect, he was also the only witness available to the police. Bradley had initiated the confrontation with the police by reporting Rhonda's absence and the circumstances surrounding her disappearance.
We also find that Bradley's consent to search was not the product of his illegal arrest. "[C]onsent can, in proper circumstances, validate a search following an illegal arrest."United States v. Ballard, 573 F.2d 913, 916 (5th Cir. 1978). See also United States v. Troutman, 590 F.2d 604, 606 (5th Cir. 1979); United States v. Fike, 449 F.2d 191, 193 (5th Cir. 1971); Bretti v. Wainwright, 439 F.2d 1042, 1046 (5th Cir.), cert. denied, 404 U.S. 943, 92 S.Ct. 293, 30 L.Ed.2d 257
(1971). The giving of the Miranda warnings and the signing of a consent to search form can satisfy the requirement of intervening circumstances. Recalde, 761 F.2d at 1458; 2 Searchand Seizure at 283, n. 90 (1985 Pocket Part). "[P]roof by the prosecution that the consenting party was warned of his rights, or that he was aware of his rights is often a significant factor leading to a finding that the consent was voluntary." 2Search and Seizure at 670-71.
In light of the cooperation actually displayed by Bradley at the police station and after his release, and considering, again, the fact that it was Bradley himself who actually initiated the investigation by reporting Rhonda's disappearance and soliciting the help of the Piedmont Police in finding her, we find that his consent to search, as well as his statements, were not tainted by the illegal arrest. *Page 767 
 III
Bradley argues that the comments by the District Attorney in his closing argument to the jury constituted an improper comment on his post-arrest silence in violation of Doyle v.Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Doyle
held that a prosecutor violates due process if he uses the defendant's post-arrest silence for impeachment purposes. This ruling was limited by Fletcher v. Weir, 455 U.S. 603,102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), which held that the prosecutor may impeach a defendant with his post-arrest silence without violating due process when the defendant's post-arrest silenceprecedes Miranda warnings.
Bradley was arrested following his indictment on March 22, 1983, and held without bond in the county jail until his trial on July 11, 1984. By a letter to his wife dated July 4, 1983, Bradley admitted that he had left the house the night of Rhonda's disappearance. This was contrary to what Bradley had earlier told the police when he had been questioned in December of 1983. The District Attorney cross examined Bradley about why he never told the police the whole truth, both before and after his arrest and argued the subject before the jury in closing argument.
As the Attorney General properly notes, here there was no evidence that Bradley was ever given Miranda warnings at either the time of his arrest upon the indictment or any time thereafter. Consequently, this case falls outside the coverage of Doyle. See Fletcher.
Additionally, "Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements." Andersonv. Charles, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182,65 L.Ed.2d 222 (1980). Here, as in Anderson, the prosecutor's questions and comments ask why, if Bradley's trial testimony were true, he didn't tell the police that he was not home all night instead of telling them that he was. "Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." Anderson,447 U.S. at 408, 100 S.Ct. at 2182, 65 L.Ed.2d 222.
Here, Bradley made two inconsistent statements — the first to the police in reporting Rhonda's disappearance and pursuant to questioning after having voluntarily waived his Miranda
rights, and the second in a letter written to his wife after his indictment. Doyle does not apply to the facts of this case. "Each of two inconsistent descriptions of events may be said to involve `silence' insofar as it omits facts included in the other version. But Doyle does not require any such formalistic understanding of `silence,' and we find no reason to adopt such a view in this case." Anderson, 447 U.S. at 409,100 S.Ct. at 2182, 65 L.Ed.2d 222.
 IV
The trial court properly denied Bradley's motion for a new trial on the ground that the State failed to disclose that Ricky McBrayer had told Glenn Burns that he killed Rhonda Hardin.
Before Bradley's trial, Piedmont Police Sergeant Brown told defense counsel that McBrayer had confessed to Rhonda's murder and informed counsel that McBrayer's confession had been investigated and found to be "without grounds. It wasn't true." However, Brown did not tell counsel that McBrayer had made the statement to Glenn "Coffee" Burns.
Glenn E. Burns testified that McBrayer told him that he had accidentally killed Rhonda. Burns told Chief Amberson about three days after the murder. Amberson instructed Sergeant Brown and an ABI agent to "dig into it, which they did and were satisfied with the fact that he didn't have anything to do with it." Amberson testified they discovered McBrayer's confession was not true because they "found out where Mr. McBrayer was that night."
Several days before the hearing on the motion for new trial, Mr. Burns told Chief *Page 768 
of Police Ricky Doyle about this matter because Burns had heard that McBrayer was "going to get" him "for going around saying he killed the girl."
Here, the exculpatory evidence — McBrayer's confession — was disclosed to defense counsel. Under Brady v. Maryland,373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." See also Exparte Duncan, 456 So.2d 362, 363 (Ala. 1984). This rule applies regardless of the trustworthiness or admissibility of the evidence. Ex parte Kimberly, 463 So.2d 1109, 1112 (Ala. 1984). Such evidence includes third-party confessions to the crime with which the defendant is charged. Sellers v. Estelle,651 F.2d 1074, 1076 (5th Cir. 1981), cert. denied, 455 U.S. 927,102 S.Ct. 1292, 71 L.Ed.2d 472 (1982); Fulford v. Maggio,692 F.2d 354, 358 (5th Cir. 1982), reversed on other grounds,462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983).
We do not think that the State's duty to disclose McBrayer's confession included the duty to disclose the person to whom that confession was made.
The rule of Brady or that of United States v. Agurs,427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), requiring the disclosure of certain exculpatory evidence, even absent a request, was not violated because the State did not inform Bradley of the man to whom McBrayer confessed. We flatly reject Bradley's argument that the failure to disclose the name of Glenn Burns "created a `red herring' which prevented the defense from pursuing an avenue of investigation which might have turned up evidence tending to exculpate the Appellant." Appellant's Brief, p. 25.
 V
The trial court did not cast doubt on Bradley's credibility by questioning him before the jury.
On direct examination, Bradley admitted that, during the night before he discovered Rhonda's absence, he left the apartment to steal a car. Because his automobile was low on gasoline, he stole or borrowed a bicycle from a house in the neighborhood and rode to the place where the car he was going to steal was located. After Bradley had been examined by defense counsel and the District Attorney, the trial court asked him a number of questions, including why he did not actually steal the car and why he did not use the bicycle instead of walking to the hospital to notify his wife of Rhonda's absence before he contacted the police.
In denying defense counsel's requested mistrial, the trial court stated:
 "THE COURT: All right. I've heard the motion. I've heard the arguments made by both sides.
 "It's the feeling of the Court when it asked the questions, that it was within its discretionary power to question a witness. I asked some questions in my mind about his testimony. The questions were not meant to and I do not feel imparted to the Jury or to anyone else that I feel one way or the other about the facts. And the Jury, in fact, will be instructed that I don't. I felt it was a reasonable area of inquiry."
We agree with the trial court's assessment of the situation. The court's questions do not fall within that category of objectionable remarks which constitute a comment on the credibility of the accused nor do we find any implication that they were calculated to reduce Bradley's credibility. Cf. Jamesv. State, 337 So.2d 1332, 1341 (Ala.Cr.App. 1976). "In the interest of justice, a trial judge is given the authority to pose questions to a witness for the purpose of clarifying the issues for the jury's consideration." Richardson v. State,403 So.2d 297 (Ala. 1981); Hardy v. State, 455 So.2d 265, 268
(Ala.Cr.App. 1984). The court's questions were directed to bringing out the facts of the case and were not error. UnitedStates v. Uptain, 531 F.2d 1281, 1291 (5th Cir. 1976). *Page 769 
 "The unquestioned province of the court — in fact, the solemn and sacred duty of a trial judge — is the development and establishment of the truth, and in this connection it is always permissible for the court, and if it appears necessary for him to do so it is his duty, to propound to witnesses such questions as it is deemed necessary to elicit any relevant and material evidence, without regard to its effect, whether beneficial to the one party or the other. Beal v. State, 138 Ala. 94, 35 So. 58. In fact, it is a sacred duty of a judge, both in civil and criminal cases, to give strict attention to the evidence, and to all facts and incidents attendant upon the trial, to propound questions to witnesses if in his judgment he deems it necessary, and to supervise and control the proceedings before him, with a view that justice may not miscarry." Brandes v. State, 17 Ala. App. 390, 391, 85 So. 824, 825
(1920).
By affording Bradley the opportunity to fully explain his reasons and his actions on the night of Rhonda's disappearance, the trial court allowed him to bolster and shore up his testimony giving previously unrelated facts and details which lent Bradley's account some semblance of truth, if in fact, any were to be found in his account to begin with.
We find no impropriety in the court's questions.
 VI
Our review of the record convinces this Court that the evidence, although totally circumstantial, was sufficient to prove that Rhonda Hardin was murdered during the commission of a rape and sodomy.
The word "during" as used in the definition of capital offenses "means in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or attempt thereof." Alabama Code 1975, §13A-5-39.
Rhonda was twelve years old when she was strangled to death. Human semen was found in her mouth, stomach, vagina and rectum. From the expert testimony presented, the jury could have properly inferred that Rhonda engaged in sexual intercourse and deviate sexual intercourse shortly before her death. Fibers from the pants Rhonda was found wearing matched other fibers found in the trunk of Bradley's automobile. There was evidence that Rhonda usually tied her shoes in a double knot. The shoes on Rhonda's body were tied in a single knot, suggesting that someone had dressed her and that she was dead before she was dressed. Fecal, semen, and vaginal fluid stains indicated that the intercourse occurred in a bedroom in Bradley's house.
Bubba Hardin last saw his sister alive sometime after 9:00 on the night of January 24, 1983. Mr. Manus, Bradley's neighbor, was with Bradley from 12:50 to 5:30 on the morning of January 25. From this, the jury could have concluded that Rhonda must have been sexually assaulted, murdered, and disposed of between 9:00 P.M. on the 24th of January and 12:50 that following morning. Considering the ages and relationships of the parties, the nature of the offense, and the time frame within which the crime and disposal of the body must have occurred, the circumstantial evidence supports the reasonable conclusion that Rhonda was murdered during, or in the course of, or in connection with, the commission of a rape and sodomy. Taylor v.State, 442 So.2d 128 (Ala.Cr.App. 1983); Potts v. State,426 So.2d 886 (Ala.Cr.App. 1982), affirmed, 426 So.2d 896 (Ala. 1983). Cf. Beverly v. State, 439 So.2d 758 (Ala.Cr.App. 1983).
Although an autopsy revealed no "evidence of trauma in genitalia area," the evidence was also sufficient to show that the element of forcible compulsion was present in both the rape, § 13A-6-61, and the sodomy, § 13A-6-63. Rhonda had been strangled. She was four feet, ten and three-eighths inches tall and weighed seventy-seven pounds. She had seven wounds or bruises on her neck. Again, the totality of all the circumstances provides ample evidence to support a finding of forcible *Page 770 
compulsion as defined by law: "Physical force that overcomes earnest resistance or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person." Alabama Code 1975, §13A-6-60(8). Under the principles of Dolvin v. State,391 So.2d 133 (Ala. 1980), and Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979), there was evidence from which the jury might reasonably conclude that the evidence and all reasonable inferences therefrom excluded every reasonable hypothesis other than guilt and proof of the corpus delicti of the charged offenses.
 VII
In sentencing Bradley to death, the trial court did not err in finding as an aggravating circumstance the fact that the capital offense was committed while Bradley was engaged in the commission of a rape, which is an aggravating circumstance described in § 13A-5-49 (4), even though rape was an element of the capital offense charged in the indictment. § 13A-5-40
(a)(3). "The fact that a particular capital offense as defined in section 13A-5-40 (a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49
shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in deterining sentence." § 13A-5-50. Ex parte Kennedy,472 So.2d 1106, 1108 (Ala. 1985); Colley v. State, 436 So.2d 11, 12
(Ala.Cr.App. 1983); Dobard v. State, 435 So.2d 1338, 1344
(Ala.Cr.App. 1982), affirmed, 435 So.2d 1351 (Ala. 1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984);Heath v. State, 455 So.2d 898, 900 (Ala.Cr.App. 1983), affirmed, 455 So.2d 905 (Ala. 1984), cert. granted in part,470 U.S. 1026, 105 S.Ct. 1390, 84 L.Ed.2d 780 (1985); Jackson v.State, 459 So.2d 963, 966 (Ala.Cr.App.), affirmed,459 So.2d 969 (Ala. 1984), cert. denied, 470 U.S. 1034, 105 S.Ct. 1413,84 L.Ed.2d 796 (1985); Julius v. State, 455 So.2d 975, 981-82
(Ala.Cr.App. 1983), affirmed, 455 So.2d 984, 987 (Ala. 1984), cert. denied, 469 U.S. 1132, 105 S.Ct. 817, 83 L.Ed.2d 809
(1985); Ex parte Kyzer, 399 So.2d 330, 337-38 (Ala. 1981).
 VIII
The trial court properly found that "[t]he capital offense was especially heinous, atrocious, or cruel compared to other capital offenses." § 13A-5-49 (8). This aggravating circumstance "was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Ex parte Kyzer, 399 So.2d 330, 334
(Ala. 1981). In Hill v. State, 422 So.2d 816 (Fla. 1982), cert. denied, 460 U.S. 1017, 103 S.Ct. 1262, 75 L.Ed.2d 488 (1983), the twenty-two-year-old defendant strangled a twelve-year-old girl after raping her. After the murder, the defendant showed the body to a friend and boasted, "She wouldn't give it up, so I had to take it." 422 So.2d at 817. The Florida Supreme Court held: "The record shows that appellant committed the rape and murder in such a fashion to make it especially heinous, atrocious, and cruel." Id. at 819.
The State of Georgia has a similar aggravating circumstance which provides, "The offense of murder . . . was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim." Ga. Code Ann. § 27-2534.1 (b)(7). In Phillips v.State, 250 Ga. 336, 340, 297 S.E.2d 217, 221 (1982), the Georgia Supreme Court held, "[t]orture may be found where the victim is subjected to serious physical, sexual, or psychological abuse before death." In the earlier case of Hancev. State, 245 Ga. 856, 861, 268 S.E.2d 339, 345, cert. denied,449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 611 (1980), that same Court held, "[t]orture occurs when the victim is subjected to serious physical abuse before death. Godfrey v. Georgia, [446] U.S. [420] p. 431-32, 100 S.Ct. [1759] p. 1766 [64 L.Ed.2d 398
(1980)]. Serious sexual abuse may be found to constitute serious physical abuse. House v. State, 232 Ga. 140, 145-47,205 S.E.2d 217, 221-222 (1974), cert. denied, 428 U.S. 910,96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976)." In House, the Georgia Supreme Court found *Page 771 
that the death penalty was not excessive or disproportionate on the conviction of a defendant on two counts of having murdered children after committing acts of sodomy upon them.
This Court has no difficulty in independently determining that this capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. In Coker v. Georgia,433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), the Supreme Court of the United States held that the sentence of death for the crime of the rape of an adult woman was grossly disproportionate and constituted excessive punishment forbidden by the Eighth Amendment as cruel and unusual punishment. In so doing, the court commented on the seriousness of the crime:
 "We do not discount the seriousness of rape as a crime. It is highly reprehensible, both in a moral sense and in its almost total contempt for the personal integrity and autonomy of the female victim and for the latter's privilege of choosing those with whom intimate relationships are to be established. Short of homicide, it is the `ultimate violation of self.' It is also a violent crime because it normally involves force, or the threat of force or intimidation, to overcome the will and the capacity of the victim to resist. Rape is very often accompanied by physical injury to the female and can also inflict mental and psychological damage. Because it undermines the community's sense of security, there is public injury as well." 433 U.S. at 597-98, 97 S.Ct. at 2869, 53 L.Ed.2d 982.
Here, Rhonda was not only raped but she was sexually abused and strangled to death. Rhonda was not an adult but a twelve-year-old child. Her assailant was her twenty-two-year-old stepfather. The especially heinous, atrocious, or cruel aggravating circumstance was warranted and fully justified in this case.
 IX
This section deals with the extent of the appellate review required in a case where the death penalty has been imposed.
This Court has searched the entire record on appeal and has found no plain error or defect which has or probably has adversely affected any substantial right of Bradley. A.R.A.P. Rule 45A.
There is no evidence in the record to indicate that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Alabama Code 1975, §13A-5-53 (b)(1).
An independent weighing of the aggravating and mitigating circumstances convinces this Court that death is the proper sentence. § 13A-5-53 (b)(2).
Considering both the crime and the defendant, the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Dunkins v. State, 437 So.2d 1349
(Ala.Cr.App.), affirmed, 437 So.2d 1356 (Ala. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984) (rape-intentional killing/death); Potts v. State, 426 So.2d 886
(Ala.Cr.App. 1982), affirmed, 426 So.2d 896 (Ala. 1983) (carnal knowledge-intentional killing/life without parole); See alsoBell v. State, 461 So.2d 855 (Ala.Cr.App. 1984) (sexual abuse-murder/life without parole); Johnston v. State,455 So.2d 152 (Ala.Cr.App. 1984) (sexual abuse-murder/life without parole).
The trial court found the existence of two aggravating circumstances: The capital offense (1) was committed while the defendant was engaged in the commission of, or flight, after committing or attempting to commit, rape, specifically rape in the first degree, § 13A-5-49 (4), and (2) was especially heinous, atrocious, or cruel compared to other capital offenses, § 13A-549 (8). The trial court did not find the existence of any statutory mitigating circumstance. § 13A-5-51. The trial court did note that it had "considered the evidence and testimony presented to the jury and to the Court in regard to the Defendant's background and character as the same pertains to the mitigating circumstances that should be properly considered *Page 772 
by the Court." An independent review convinces this Court that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence.
Review convinces this Court that Danny Joe Bradley received a fair trial and that his conviction of a capital offense and sentence to death are proper and due to be affirmed.
AFFIRMED.
All Judges concur.
[1] Piedmont Police Office Greg Kiser testified at the suppression hearing that he was not present when Bradley was "picked up for questioning at his home." Officer Murphy testified that he was accompanied by Officer Terry Kiser. Terry Kiser never testified.